# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **GREGORY E. LINDBERG, CHRISTOPHER HERWIG, and STANDARD ADVISORY SERVICES LIMITED,** <br><br> Defendants. | Case No. 22-cv-715 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") brings this action against Defendants Gregory E. Lindberg ("Lindberg"), Christopher Herwig ("Herwig"), and Standard Advisory Services Limited ("SASL"), and alleges as follows:

## SUMMARY

1.      From July 2017 through 2018, Lindberg and Herwig perpetrated multiple schemes to defraud their advisory clients. Lindberg and Herwig, through Lindberg's Malta-based investment adviser SASL, breached their fiduciary duties to their advisory clients by engaging in numerous undisclosed related-party transactions and by misappropriating over $57 million in client funds. During the course of their fraud, SASL collected over $21.4 million in advisory fees from the defrauded clients, which Lindberg doled out to himself and/or to his affiliated businesses. All told, Lindberg wrongfully obtained over $75 million from the schemes.

2.     The basic premise of Defendants' fraudulent scheme is simple: Lindberg, Herwig, and SASL, all fiduciaries, repeatedly recommended and entered into transactions that were not disclosed to and were not in the best interests of their clients. Yet, the mechanics they used to accomplish the fraud were, by design, complex.

3.     By 2017, Lindberg had acquired 100% ownership of four North Carolina insurance companies ("NC Insurance Companies") and a reinsurance trust, which gave him control over hundreds of millions of dollars in premiums from their policyholders. Although the funds were supposed to be used to pay the policyholders' insurance claims, Lindberg treated the funds as his own assets and used the money for any purpose he decided was in *his* best interest.

4.     Lindberg directed his insurance companies to enter into investment advisory services agreements with SASL, a Malta-based investment adviser he owned. As an SEC-registered investment adviser, SASL had a fiduciary duty to make full and fair disclosures of all material facts to its clients and to serve the ***best interests of its client*** at all times. As agents of SASL, Lindberg and Herwig owed the same fiduciary duty to SASL's advisory clients.

5.     From July 2017 through 2018, Lindberg, Herwig, and SASL, in breach of their fiduciary duties, acted in their self-interest and raided their advisory clients' assets through a series of fraudulent and improper schemes.

6.     For example, in one scheme, Lindberg and Herwig advised their clients to enter into an illogical and complex set of transactions to mask Lindberg's misappropriation of their funds. Specifically, Lindberg and Herwig advised the NC Insurance Companies to sell their interests in certain Lindberg-affiliated special purpose vehicles ("SPVs") and then to re-purchase essentially the same investments through a different investment vehicle at a

2

higher price. Lindberg pocketed the difference, which was more than $57 million. From November 2017 through June 2018, Lindberg and Herwig caused the NC Insurance Companies to enter into thirteen (13) such transactions. Lindberg and Herwig used the fraudulent "profits" to enrich Lindberg and to support his other businesses. All the while, the board members of the NC Insurance Companies were left in the dark about Lindberg's misappropriation.

7.     In another scheme, Lindberg and Herwig funneled millions of dollars of cash to Lindberg-owned affiliates by loading the balance sheet of another SASL advisory client, Private Bankers Life & Annuity Co ("PBLA"), with prohibited and/or sham investments. Specifically, Lindberg and Herwig advised PBLA to purchase (a) millions of dollars of securities issued by Lindberg affiliates and (b) hundreds of millions of dollars in illiquid, sham "repurchase agreements" ("Repos") issued by Lindberg affiliates. These related-party transactions violated PBLA's reinsurance trust agreement. The Repos, issued by Lindberg-controlled entities that had no ability or intention to redeem the purportedly short-term liquid investments, violated governing insurance law and PBLA's investment guidelines and forced PBLA to assume substantial and unnecessary risk. In the end, PBLA was left holding hundreds of millions of dollars of illiquid, sham Repos while Lindberg and his businesses held cash.

8.     In each scheme, Lindberg, Herwig, and SASL violated their fiduciary duties to their advisory clients. They fraudulently diverted more than $57 million of SASL's advisory clients' funds and failed to serve the best interests of their advisory clients. In executing the fraud, SASL collected over $21.4 million in investment advisory fees from its defrauded advisory clients. Lindberg and Herwig used the proceeds of the fraudulent

schemes to pay themselves, to acquire new investment opportunities on behalf of Lindberg, and to transfer large sums of money to Lindberg and his affiliated companies.

9.     Rather than using their clients' funds for their clients' best interest, Lindberg and Herwig spent the illicit profits from these schemes for their own benefit. Herwig received annual salaries ranging from $947,000 to $1.6 million. Lindberg funneled millions of dollars to his personal cash accounts and directed SASL to loan more than $35 million to companies he owned and controlled. He also directed SASL to issue dividends (to a shell parent company he owned) totaling approximately $12.9 million.

10.     As a result of the fraudulent schemes, the long-term liquidity of the NC Insurance Companies' investment portfolios were compromised and they were consequently placed into receivership. PBLA filed for bankruptcy.

11.     Lindberg and Herwig declined to testify during the SEC's investigation, asserting their Fifth Amendment right against self-incrimination.

12.     The SEC brings this enforcement action seeking permanent injunctions, disgorgement with prejudgment interest, and civil penalties against Lindberg, Herwig, and SASL as a result of their violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1) and (2)].

## JURISDICTION AND VENUE

13.     The Commission seeks permanent injunctions and disgorgement pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

4

14.     The Court has jurisdiction over this civil enforcement action pursuant to Sections 209(d), 209(e), and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80(b)-9(e), 80b-14(a)].

15.     Venue is proper in this District because most of the Defendants currently reside or transact business in this District, and many of the acts and transactions constituting the securities law violations alleged herein occurred within this District. Specifically, many of the acts and transactions detailed below took place at the office building Lindberg maintained in Durham, North Carolina.

16.     In connection with the conduct alleged in this Complaint, Defendants have directly and indirectly made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

17.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, act, practices and courses of business set forth in this complaint, and transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

18.     **Gregory E. Lindberg** ("Lindberg"), age 52, is a resident of Durham, North Carolina. Lindberg was the founder and Chairman of Eli Global, a privately held investment company headquartered in Durham, North Carolina and was the ultimate beneficial owner of more than 500 affiliated entities. During the relevant time period of 2017 through 2018, Lindberg owned SASL, was a director of SASL, and was a member of SASL's investment committee. He was a board member for each NC Insurance Company

and a member of the investment committee. Lindberg entered into an agreement with the SEC to toll or suspend the running of any statute of limitation for a period of 90 days.

19.    **Christopher Herwig** ("Herwig"), age 43, is a resident of Raleigh, North Carolina. From 2010 through 2018, Herwig was the Chief Investment Officer ("CIO") for Eli Global and from 2016 through 2018, he was the CIO of the NC Insurance Companies. Herwig was a board member for each NC Insurance Company and the chair of the investment committee. During the relevant time period of 2017 through 2018, Herwig was a director of SASL, a member of SASL's investment committee, and SASL's portfolio manager. Herwig received compensation from SASL and other Lindberg companies for providing investment advisory services. Herwig entered into an agreement with the SEC to toll or suspend the running of any statute of limitation for a period of 90 days.

20.    **Standard Advisory Services Limited** ("SASL"), a limited liability company with its principal place of business in Valletta, Malta, was registered with the SEC as an investment adviser from November 2016 until it withdrew its registration on October 1, 2019. SASL is licensed by the Malta Financial Service Authority to provide investment advice to professional clients. Lindberg indirectly owns SASL and Lindberg and Herwig were directors of SASL and were members of SASL's investment committee. SASL entered into an agreement with the SEC to toll or suspend the running of any statute of limitation for a period of 90 days.

## RELATED ENTITIES

21.    Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), Southland National Reinsurance Corporation ("SNRC"), and Colorado Bankers Life Insurance Company ("CBL") (collectively, the "**NC Insurance**

**Companies**") are North Carolina domiciled insurance companies indirectly owned by Lindberg. The NC Insurance Companies' principal place of business is Durham, North Carolina.

22.     On June 27, 2019, the NC Insurance Companies consented to an Order of Rehabilitation by the Superior Court of Wake County, North Carolina pursuant to a petition filed by the Commissioner of Insurance of the State of North Carolina. The Commissioner's petition was filed to protect the interests of the policyholders after the Commissioner determined that the long-term liquidity of the NC Insurance Companies' investment portfolios had deteriorated due to the large amount of investments that they had made in Lindberg-affiliated companies. The non-affiliated investments were invested primarily in publicly-traded securities. The Rehabilitator has stated that the goal of the rehabilitation is to reduce the amount of affiliated investments and to increase long-term liquidity of the NC Insurance Companies.

23.     Private Bankers Life and Annuity Co. Ltd. ("**PBLA**") is a Bermuda stock life insurance company that entered into a coinsurance reinsurance agreement with Universal Life Insurance Company ("ULICO"), a Puerto Rico stock life insurance company, dated June 30, 2017. Under that agreement, PBLA agreed to reinsure certain ULICO insurance lines in exchange for ULICO ceding to PBLA certain ULICO liabilities and assets. PBLA is beneficially owned by Lindberg. PBLA is wholly owned by BMX Bermuda Holdings, Ltd., which in turn is wholly owned by BMX Holdings, LLC, which in turn is wholly owned by Lindberg. ULICO is privately owned and not affiliated with Lindberg.

24.     On September 25, 2020, the Supreme Court of Bermuda granted a petition filed by the Bermuda Monetary Authority to wind up the business operations of PBLA. On

7

December 3, 2020, the Bermuda court-appointed liquidators filed a verified petition on behalf of PBLA for relief under Chapter 15 of the United States Bankruptcy Code ("Bankruptcy Code"), seeking recognition of the Bermuda proceeding as a foreign main proceeding or, in the alternative, as a foreign non-main proceeding under section 1517 of the Bankruptcy Code.

25.     **Eli Global**, founded by Lindberg in 1991, was a privately-held consortium of over 100 companies. Eli Global was headquartered in Durham, North Carolina and was managed by Lindberg. Eli Global purportedly was an information and service management company that acquired and invested in insurance and annuities, healthcare, media, market intelligence, certification, and other associated businesses.

26.     Global Bankers Insurance Group, LLC ("**GBIG**"), was a North Carolina limited liability company with its principal place of business in Durham, North Carolina. GBIG was owned by Lindberg and was the overarching brand and management company for Lindberg's insurance operations. GBIG was formerly known as Southland National Holdings, Inc. GBIG is currently known as Aspida Financial Services, LLC.

27.     Academy Financial Assets, LLC ("**AFA**") is a North Carolina domiciled limited liability company with its principal place of business in Durham, North Carolina. AFA is indirectly owned by Lindberg. AFA's sole member is Academy Financial Holdings LLC, which is organized under the laws of North Carolina and its sole member is Global Growth Holdings, Inc. f/k/a Academy Association Inc. Lindberg controlled AFA and the hundreds of millions of dollars flowing into and out of AFA on a monthly basis.

I.    **Lindberg's North Carolina Insurance Companies**

28.    In or around 2014, Lindberg began acquiring insurance and reinsurance companies.

29.    By mid-2017, Lindberg had acquired four insurance companies domiciled in North Carolina: SNIC, BLIC, SNRC, and CBL. These companies sold products such as life insurance policies and annuities to consumers. Consumers (*e.g.*, policyholders) paid cash premiums to the NC Insurance Companies with the expectation that the companies would make timely payments on the products they purchased.

30.    The acquisitions gave Lindberg control over the NC Insurance Companies' assets worth over hundreds of millions of dollars.

31.    Lindberg had a 100% indirect ownership interest in each NC Insurance Company through a web of holding companies and subsidiaries.

32.    Each NC Insurance Company had a five member board of directors, consisting of (1) Lindberg, (2) Herwig, (3) a non-independent director, and (4 & 5) two independent directors. Lindberg was the Chairman of each NC Insurance Company's Board of Directors and a member of the Investment Committee. Herwig was the Chief Investment Officer and the Chair of the Investment Committee.

33.    In or around 2016, Lindberg created a holding company known as Global Bankers Insurance Group ("GBIG") to manage his insurance operations, including the NC Insurance Companies and PBLA. GBIG shared employees with Eli Global and other Lindberg-affiliated entities.

34.    The day-to-day business of the NC Insurance Companies was carried out by GBIG employees located in Durham, North Carolina.

35.    Generally, insurance companies like the NC Insurance Companies must comply with state law mandated capital requirements to ensure the company has sufficient cash and/or liquid assets to pay policyholder claims in a timely manner. State insurance regulators limit the risk of insurance companies becoming insolvent by restricting certain business practices, by conducting financial oversight, and by establishing risk-based capital requirements.

36.    Each NC Insurance Company was required to invest its funds consistent with North Carolina insurance law, which meant that the securities needed to be invested in stable, low-risk securities.

37.    Each NC Insurance Company maintained a written investment policy and/or investment guidelines which, along with the North Carolina insurance law, governed the asset classes (*e.g.*, U.S. Treasury Securities, corporate debt obligations, asset-backed securities, etc.) and the asset concentration levels in which each insurance company could invest. The stated objective of each of the NC Insurance Company's investment strategies was to preserve capital by investing in stable, conservative, and highly liquid assets.

## II.    Lindberg's PBLA and the PBLA Trust Agreement

38.    In or around June 2017, Lindberg, PBLA's owner, caused PBLA to enter into (a) a coinsurance reinsurance agreement ("PBLA Reinsurance Agreement") and (b) a reinsurance trust agreement ("PBLA Trust Agreement") with ULICO.

39.    Under those agreements, PBLA was to reinsure certain life insurance and annuities ULICO had issued to its policyholders. In exchange, ULICO ceded certain of its

10

assets, including relevant statutory reserves, to PBLA. PBLA was given the right to manage the investment of ULICO's assets. Because Lindberg owned and controlled PBLA, the agreements gave Lindberg control over ULICO's hundreds of millions of dollars of assets.

40.     In managing ULICO's assets, PBLA agreed to adhere to the PBLA Reinsurance Agreement, the PBLA Trust Agreement, Puerto Rico law, and the Investment Guidelines incorporated into the PBLA Trust Agreement, which detailed the asset classes (*e.g.*, U.S. Treasury Securities, corporate debt obligations, asset-backed securities, etc.) and the asset concentration levels in which PBLA could invest.

41.     Under the PBLA Trust Agreement, PBLA agreed that only "qualifying trust assets" would be maintained in the trust account. The term "qualifying trust assets" was defined as "cash … and investments permitted by the Puerto Rico Insurance Code; provided, however, that such investments are issued by an institution that is not the parent, a subsidiary or an affiliate of either [ULICO or PBLA]." (emphasis in original). In other words, the PBLA Trust Agreement expressly prohibited PBLA from purchasing investments issued by Lindberg affiliates.

42.     The stated objective of PBLA's Investment Guidelines was to preserve capital by investing in stable, conservative, and highly liquid assets.

III.    **Lindberg Directed the NC Insurance Companies and PBLA to Use SASL as their Investment Adviser.**

43.     Lindberg formed SASL in February 2016 for the purpose of providing investment advisory services to his affiliated entities, including the NC Insurance Companies and PBLA.

44.     SASL was registered with the SEC as an investment adviser from November 2016 to October 2019 and also obtained a license to provide investment advice from the Malta Financial Services Authority.

45.     Lindberg directed the NC Insurance Companies and PBLA to use SASL as their investment adviser.

46.     SASL provided investment advisory services to the NC Insurance Companies and PBLA pursuant to written Investment Advisory Services Agreements. Among other things, SASL was retained to provide "securities investment advice" and to make "investment recommendations" regarding "securities," "securities assets," and/or "securities investments" to the NC Insurance Companies and PBLA.

47.     Lindberg and Herwig, as agents of SASL, managed and controlled the NC Insurance Companies' investments and PBLA's investments. They each had the authority to recommend, approve, direct, buy, and sell investments and securities on behalf of each NC Insurance Company and PBLA. They each were responsible for the NC Insurance Companies' and PBLA's overall investment management strategy and they each recommended the purchase and sale of securities on behalf of those entities.

48.     At all times relevant to this Complaint, Lindberg, Herwig, and SASL acted as investment advisers to the NC Insurance Companies and to PBLA within the meaning of the Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

49.     SASL held itself out to the public as an investment adviser and attempted to secure European-based insurance companies as clients who were wholly independent from Lindberg.

12

50.     As an SEC-registered investment adviser, SASL owed a fiduciary duty to the NC Insurance Companies and PBLA. SASL's fiduciary duty comprised both the duty of care and the duty of loyalty. SASL's fiduciary duty included the obligation to make full and fair disclosure of all material facts and to at *all times* act in the best interest of the NC Insurance Companies and PBLA.

51.     SASL's fiduciary duty was memorialized in its policies and procedures and extended to all of its directors, officers, agents, and employees, including Lindberg and Herwig.

52.     SASL's Compliance Manual and Code of Ethics stated: "As a fiduciary, SASL is held to the highest standard of care and loyalty and must be particularly sensitive to situations in which the interests of Advisory Clients are in conflict with those of SASL. Supervised Personnel should be aware of any potential conflicts …."

53.     SASL's Compliance Manual and Code of Ethics further stated: (a) "[a]s a fiduciary, SASL will act in its Advisory Clients' best interest;" and (b) that "SASL [sic] fiduciary obligations require its employees to place the interests of clients before their own and to avoid conflicts of interest or even the appearance of a conflict of interest."

54.     SASL's obligation to act in the best interest of its clients was reinforced by its Investment Advisory Committee Charter, which stated that the SASL investment committee was responsible for ensuring that SASL's investment recommendations reflect the advisory client's investment objectives and comply with any requirements set out in the investment management agreement. The Charter further mandated that advisory committee members like Lindberg and Herwig must declare their interest in any contract or

arrangement which is being or about to be discussed by the advisory client and that a record of such declaration shall be entered into the Advisory Committee's minute books.

55.     Lindberg and Herwig, as agents of SASL, owed the same fiduciary duty to the NC Insurance Companies and PBLA, SASL's advisory clients.

56.     Under the Investment Advisory Services Agreements, the NC Insurance Companies and PBLA paid SASL advisory fees.

57.     SASL's advisory fees for the NC Insurance Companies varied based on the type of investment being recommended, but generally included (a) a predetermined percentage of investments in a particular asset plus (b) a performance fee based on the performance of the asset. For example, under the November 3, 2017 Investment Advisory Services Agreement, the NC Insurance Companies paid SASL advisory fees of 1.2% on all invested assets in private placements plus a 20% performance fee above an annual 7% total return threshold.

58.     PBLA paid SASL advisory fees of 1.00% per annum of PBLA's total assets.

59.     Between early 2017 and 2019, SASL received millions of dollars in fees from the NC Insurance Companies and PBLA, which it disseminated to Lindberg (via dividends) or to Lindberg affiliated entities (via dividends and/or loans).

60.     For investment advisory services rendered from November 2017 through June 2018, the NC Insurance Companies paid SASL approximately $15,515,349 in advisory fees.

61.     For investment advisory services rendered from June 2017 through 2018, PBLA paid SASL approximately $5,938,421 in advisory fees.

62.     Lindberg disseminated millions of dollars of SASL's advisory fees to himself and to his affiliated entities that were unrelated to his advisory clients.

14

63.     In fiscal year 2017, SASL made two unsecured loans totaling $17,900,000 to Lindberg-affiliated entities. Lindberg executed the loan agreements on behalf of SASL and signed the SASL resolution authorizing the loans.

64.     In fiscal year 2018, SASL made two additional unsecured loans totaling $16,816,695 to Lindberg-affiliated entities. Lindberg and/or Herwig executed the loan agreements on behalf of SASL and signed the SASL resolution authorizing the loans.

65.     As of December 31, 2018, SASL had made four unsecured loans to Lindberg-affiliated entities totaling $35,695,799.

66.     On December 20, 2018, SASL issued a dividend of $1,143,000.

67.     On January 10, 2019, SASL issued a dividend of $8,500,000.

68.     On April 12, 2019, SASL issued a dividend of $3,000,000.

## IV.     Lindberg and Herwig Controlled the NC Insurance Companies' Investments.

69.     The NC Insurance Companies were required to abide by North Carolina insurance laws regarding the nature and amount of their investments or, alternatively, receive approvals from the Commission of the North Carolina Department of Insurance ("NC DOI") to deviate from such requirements.

70.     Although the board of directors ("Board") for each NC Insurance Company was required to "approve" all investments, Lindberg and Herwig controlled and managed all investments made by the NC Insurance Companies and did so with little oversight from the Boards. In fact, Lindberg and Herwig would buy and/or sell investments on behalf of the NC Insurance Companies and then months later notify their Boards of the investments they had made.

71.     When Lindberg acquired the NC Insurance Companies, the NC DOI
purportedly permitted the NC Insurance Companies to invest up to 40% of each insurance
companies' total admitted assets in affiliated debt, which exceeded North Carolina statutory
limits.

72.     The cap on affiliated investments posed a challenge for Lindberg and Herwig
because their primary investment strategy was to invest in Lindberg-affiliated middle-market
debt, private placement offerings issued by entities owned directly or indirectly by Lindberg.
For most affiliated investments, Lindberg and/or Herwig executed the agreements on behalf
of both the buyer and seller.

73.     Quickly after acquiring the NC Insurance Companies, Lindberg and Herwig
tried to circumvent DOI's 40% cap on affiliated investment by using various investment
structures. Initially, they directed and caused the NC Insurance Companies to purchase
hundreds of millions of dollars of notes issued by Special Purpose Vehicles ("SPVs," and
"SPV Notes"). The SPVs were pass-through entities that made loans directly to a single
Lindberg-affiliated entity.

74.     In fall 2017, NC DOI, following a review of the NC Insurance Companies'
investments, found, among other things, that the NC Insurance Companies' investments in
the SPV Notes should have been reported as related-party transactions because the proceeds
of the SPV Notes went directly to Lindberg or his affiliated entities. Although Lindberg and
Herwig objected to NC DOI's findings, they agreed to eliminate and/or reduce the NC
Insurance Companies' investments in the SPV structures.

75.     Beginning in or around October 2017, Lindberg and Herwig once again tried
to circumvent the cap on affiliated investments by converting the NC Insurance Companies'

16

investments in notes issued by SPVs into notes issued by Finance Companies ("FinCos"). As reflected in Diagram 1 below, the FinCos (*e.g.*, Summerville Asset Management) were purportedly managed by a third party and backed by a pool of Lindberg-affiliated middle market loans. Many of the loans underlying the FinCos were the same loans underlying the SPV structures.

76. Under the FinCo structure, the NC Insurance Companies purchased an interest in a senior secured note ("FinCo Note") issued by a FinCo via a private placement memorandum. The FinCos issued the FinCo Notes for the purpose of raising money for their general use and/or to finance investments. The FinCos purportedly offered the FinCo Notes to non-Lindberg affiliated insurance companies. The FinCo used a substantial portion of the proceeds of the FinCo Notes to make loans to Lindberg-affiliated companies. The FinCo Notes paid variable interest, which was distributed to the NC Insurance Companies (and other investors) on a pro-rata basis. As reflected in Diagram 1, Lindberg and Herwig offered the FinCo Notes to third-party insurance companies.

## Diagram 1: FinCo Structure



**Example: Summerville Asset Management ("SAM")**
- Coupon: L+4.75%, 1% floor
- Issue Date: 11/8/2017
- Maturity Date: 12/31/2027
- NAIC Designation: 1FE

| Intermediary | Principal |
|---|---|
| A.C.I. COMPUTER SERVICES INV LTD | 2,250,000 |
| AGH Parent, LLC | 428,134 |
| AR Allegiance Group, LLC | 1,031,250 |
| ASIM Holdings, LLC | 3,000,000 |
| Atlas Financial Investments, LLC | 3,000,000 |
| IMW EMR, LLC | 3,301,829 |
| Integrity EMR, LLC | 1,856,250 |
| KeyMed, LLC | 853,875 |
| MRX Holdings, LLC | 742,500 |
| PBX Holdings, LLC | 1,875,000 |
| Standard Financial Limited | 2,250,000 |
| Toniq Investments Limited | 914,625 |
| Transcontinental Holdings, LLC | 1,875,000 |
| OMPC DIAGNOSTIC, LLC | 891,000 |
| MBS Investments Pty LTD | 3,000,000 |
| Medflow Holdings, LLC | 1,410,000 |
| Equity | 1,320,537 |
| Total | 30,000,000 |

17

77.     Contrary to the representation in the private placement memoranda, the FinCos were *not* managed by a third party. Lindberg and Herwig controlled the FinCos and determined how the FinCo Note proceeds were distributed and used.

78.     For example, the private placement memorandum for the $40 million FinCo Note issued by Kite Asset Management ("KAM") stated that the FinCo would be managed by Person A and that KAM would use the funds to purchase "floating rate middle market loans." In reality, Lindberg (not Person A) controlled KAM and he directed KAM to use $3.3 million in FinCo Note proceeds to finance the purchase of a home, Morning Mountain in Wake County, North Carolina, which he used as his personal residence.

79.     As of December 31, 2017, the NC Insurance Companies had purchased hundreds of millions in FinCo Notes.

V.    **First Fraudulent Scheme – The $57 Million Dollar FinCo Misappropriation**

80.     In converting the NC Insurance Companies' investment in SPV Notes to FinCo Notes, Lindberg and Herwig devised a scheme, in breach of their fiduciary duties, to misappropriate millions of dollars from the NC Insurance Companies.

81.     Specifically, Lindberg and Herwig inserted a Lindberg-affiliated entity, Academy Financial Assets, LLC ("AFA"), as an intermediary into the transaction for the sole purpose of diverting NC Insurance Companies' funds to Lindberg. Through a series of transactions, each authorized and approved by Lindberg and Herwig, AFA purchased certain loans from the SPVs and then resold the same loans to the FinCos at an inflated price. In short, the NC Insurance Companies paid an unnecessary mark-up that went directly to Lindberg.

82. Each SPV to FinCo conversion generally involved four steps:

Step #1: The NC Insurance Companies sold their interests in the SPV Notes to AFA at ***Book Adjusted Carrying Value ("BACV")***, plus accrued interest (*e.g.*, NC Insurance Companies sold to AFA its interests in a SPV note for $1,200,000);

Step #2: The NC Insurance Companies purchased an interest in a note issued by a FinCo. (*e.g.*, NC Ins. Co. purchased a $30m note issued by the FinCo Summerville Asset Management);

Step #3: The FinCo (*e.g.*, SAM) purchased from the SPVs the loans underlying the SPV Note ***at par*** plus accrued interest. The par value was greater than BACV (*e.g.*, SAM re-purchased the loan underlying the same SPV in Step #1 for $1,400,000 ($200,000 more than BACV)); and

Step #4: The SPVs distributed the full purchase price (***par*** plus accrued interest) they received from the FinCos to AFA (*e.g.*, the SPV paid ***par*** plus accrued interest, $1,400,000, to AFA).

**Diagram 2: FinCo Misappropriation**



83. That is, following the four transactions, the NC Insurance Companies sold and re-purchased an interest in essentially the same underlying asset (a loan to a Lindberg-

19

affiliated entity), which was repackaged and sold to them at a higher price. So while AFA provided no services and no benefit to the NC Insurance Companies or the SPVs, it pocketed the difference between (a) BACV and (b) par. Internally, Lindberg and others referred to this delta as AFA's "profits."

84.     AFA was a late addition to the SPV-to-FinCo conversions. As originally structured, the FinCos were supposed to (a) purchase the SPV Notes from the NC Insurance Companies and/or (b) purchase the loans from the SPVs. Five days before the first conversion, AFA was inserted into the transactions as a way to divert cash to Lindberg for his personal benefit and for the benefit of his other businesses.

85.     Lindberg and Herwig each knew about and approved all aspects of the four transactions described above. Each signed a "Commitment Transaction Advice" memo on behalf of the NC Insurance Companies which "confirm[ed] their purchase of the … securities." Lindberg, on behalf of the FinCos, signed bank closing documents and wire instructions authorizing the purchases and sales detailed above. Herwig signed investment recommendation letters directing the NC Insurance Companies to invest millions in the FinCo Notes. And Lindberg and Herwig signed several transactional documents (assignment and assumption agreements, security and loan agreements, etc.) to facilitate the SPV-to-FinCo conversions.

86.     From November 2017 through June 2018, Lindberg and Herwig facilitated at least 13 such SPV-to-FinCo conversions and misappropriated more than $57 million from the NC Insurance Companies. During the same period, the NC Insurance Companies paid SASL approximately $15,515,349 in investment advisory fees.

**Table 1: FinCo Misappropriation**

| Date | FinCo | AFA Price (BACV + interest) | FinCo Price (Par + interest) | AFA Misappropriation |
|---|---|---|---|---|
| 11/8/17 | SAM | $34,112,891 | $39,020,130 | $4,907,239 |
| 11/9/17 | BAM | $29,824,876 | $33,893,168 | $4,068,292 |
| 11/10/17 | CAM | $27,508,974 | $30,448,341 | $2,939,367 |
| 11/15/17 | DAM | $26,227,417 | $29,932,181 | $3,704,764 |
| 11/16/17 | EAM | $28,743,540 | $31,318,133 | $2,574,593 |
| 11/17/17 | FPAM | $29,193,727 | $33,829,691 | $4,635,964 |
| 2/2/18 | HAM | $12,199,334 | $14,005,900 | $1,806,566 |
| 2/2/18 | ICAM | $11,259,896 | $12,741,323 | $1,481,427 |
| 2/2/18 | JAM | $10,855,100 | $12,325,678 | $1,470,578 |
| 6/12/18 | KAM | $33,772,848 | $39,827,642 | $6,054,794 |
| 6/14/18 | LAM | $34,353,097 | $40,934,024 | $6,580,927 |
| 6/20/18 | PAM | $34,937,817 | $40,302,446 | $5,364,629 |
| 6/27/18 | RAM | $29,205,876 | $40,631,430 | $11,425,554 |
| | | | **Total** | **$57,014,694** |

87.     Lindberg, through AFA, used the misappropriated funds (a) for his personal use, (b) to acquire other business opportunities under his Eli Global umbrella, and (c) to support the cash needs of his affiliated businesses. For example, in June 2018, Lindberg funneled more than $4 million of the misappropriated funds to a personal cash account.

88.     The mechanics of the SPV-to-FinCo conversations were, by design, complex and contrived to create maximum confusion and a lack of transparency. Lindberg and Herwig concealed from the NC Insurance Companies' Boards the details of the SPV-to-FinCo conversions. The Boards did not know of AFA's involvement, the price the FinCos paid the SPVs for the underlying loans, or that Lindberg pocketed the difference. The Boards also had no information regarding the FinCo structures or that the FinCos made loans to Lindberg-affiliated entities. Despite authorizing both sides of the transactions, Herwig and Lindberg also did not disclose to the Boards the conflicts of interest.

89.     The misappropriation of $57 million dollars and the 13 undisclosed transactions directed, authorized, and caused by Lindberg, Herwig, and SASL were not in the NC Insurance Companies' best interest and weakened the liquidity of the NC Insurance Companies.

## VI.    Second Fraudulent Scheme – Investing PBLA's Funds in Lindberg-Affiliated Investments and Sham Repos

90.     Lindberg and Herwig also devised a scheme to extract millions of dollars in cash or other highly liquid assets from the PBLA trust (*e.g.*, ULICO) to finance the growth of Lindberg's other businesses.

91.     Lindberg, Herwig, and SASL each breached their fiduciary duty by advising PBLA to invest in ways that violated the PBLA Trust Agreement, PBLA's investment guidelines, and Puerto Rico insurance law. As a result, PBLA assumed substantial and unnecessary risk.

### A.     Lindberg and Herwig Recommended that PBLA Purchase Investments Prohibited by the PBLA Trust Agreement.

92.     The PBLA Trust Agreement expressly prohibited PBLA from holding affiliated investments. Nevertheless, immediately after causing PBLA to enter into the agreement, Lindberg and Herwig directed, authorized, and caused PBLA to buy millions of dollars in notes issues by SPVs which served as pass-throughs for entities owned and/or controlled by Lindberg and to purchase millions of dollars of preferred equity in an entity owned and controlled by Lindberg.

93.     For example, in July 2017, Lindberg and Herwig directed, authorized, and caused PBLA to send approximately $44 million in cash to AFA, Standard Financial

Limited, and Standard Malta Holdings Limited. These entities were controlled and owned, directly or indirectly, by Lindberg.

94. PBLA made these investments via notes issued by Lindberg-affiliated SPVs. PBLA expected to make a profit on the notes (around 7%) and the notes were issued to raise money to finance substantial investments.

95. The next month, Lindberg and Herwig directed, authorized, and caused PBLA to purchase $18 million of preferred equity in Southland National Holdings, Inc., an entity wholly owned by Lindberg.

96. These investments clearly violated the PBLA Trust Agreement's prohibition against affiliated investments.

97. Lindberg and Herwig each executed documents authorizing and approving PBLA's purchases of the affiliated investments. Lindberg, acting on behalf of AFA, Standard Financial Limited, and Standard Malta Holdings Limited, executed the closing instructions sending approximately $44 million dollars to those entities and Herwig, as "investment manager" to the PBLA reinsurance trust, executed wire instructions and investment memos approving and authorizing the movement of approximately $44 million dollars to those entities. Lindberg and Herwig, on behalf of PBLA, each signed a "Commitment Transaction Advice" memorandum for each purchase which "confirm[ed] the purchase of the … securities."

98. Lindberg and Herwig each signed several transactional documents (*e.g.*, assignment and assumption agreements, commitment transaction advice memos, stock purchase agreements, etc.) facilitating the transactions. And Herwig, in his capacity as "Investment Manager to the PBLA ULICO 2017 Reinsurance Trust," executed a wire

23

instruction memo authorizing the purchase of the affiliated SPV investments. In the memo, he falsely certified that the SPV transactions were "not inconsistent with or in violation of the terms of the Trust Agreement or any documents to which the Trust or the Trustee is a party."

99.     Likewise, Lindberg executed the preferred equity stock purchase agreement on behalf of Southland National Holdings, Inc. (as its President) and on behalf of PBLA (as its Chairman). Lindberg and Herwig each signed a "Commitment Transaction Advice" memo on behalf of PBLA which "confirm[ed] our purchase of the [Southland preferred equity] securities."

100.     Lindberg, Herwig, and SASL breached their fiduciary duties to PBLA by recommending and causing PBLA to enter into affiliated transactions that violated the PBLA Trust Agreement.

**B.     The Sham Repo Agreements**

101.     Lindberg, Herwig, and SASL also breached their fiduciary duties to PBLA by filling PBLA's balance sheet with sham Sale and Purchase Agreements ("Repos").

102.     A Repo is a form of short-term financing. Under the PBLA Repos, PBLA sent millions of dollars of cash to the Repo Seller (a Lindberg-affiliate) and, in exchange, purportedly received an interest in certain collateral and a promise that the Repo Seller would repurchase that interest in 90-days, at a slightly higher price. PBLA purchased the Repos to make a profit and the Repo Sellers issued the Repos for the purpose of raising money for their general use and/or to finance other investments.

103.    Beginning in or around January 2018, Lindberg and Herwig directed, authorized, and caused PBLA to invest more than $160,000,000 in Repos issued by Lindberg-affiliated entities.

104.    Like the SPV transactions, Lindberg and Herwig each executed documents authorizing and approving the Repo transactions. Lindberg executed several of the Repo agreements on behalf of each counterparty. Herwig, in his capacity as "Investment Manager to the PBLA ULICO 2017 Reinsurance Trust," executed wire instruction memos authorizing the purchase of the Repos. Lindberg and Herwig each signed "Commitment Transaction Advice" memos on behalf of PBLA which authorized the purchase of the Repos.

105.    Lindberg and Herwig recommended and authorized the Repo transactions despite knowing that the Repos were prohibited under the PBLA Trust Agreement, PBLA's Investment Guidelines, and Puerto Rico law. These agreements, and Puerto Rico insurance law, authorized PBLA to invest in "cash equivalents," which was defined as "short term investments … of high credit classification and great liquidity, easily convertible into known amount of cash … [that] are so close to maturity that they represent a minimal risk of change in their value … with a maturity term of ninety (90) days or less." P.R. Laws. Title 26, § 648(21).

106.    The Repos issued by the Lindberg-affiliates, however, were not liquid, low risk, or short-term investments. To the contrary, Lindberg and Herwig knew that the Lindberg affiliates issuing the Repos had no intention or ability to repurchase within 90 days because they directed and caused the Repos issuers to transfer the proceeds of the Repos to another Lindberg entity for the purpose of acquiring another entity. Following the transfers,

25

Lindberg and Herwig knew the Repo issuers did not have sufficient capital to satisfy their repurchase obligation under the Repos. So when the Repos approached their 90-day maturity date, they merely "rolled forward" the maturity date an extra 90-days. Lindberg and Herwig extended the Repos maturity date several times.

107.    As of February 2022, many of the Repos that PBLA had entered into in January 2018, which purportedly had 90-day maturities, remained on PBLA's balance sheet.

108.    On multiple occasions, Lindberg and Herwig also directed PBLA to enter into Repo transactions with no underlying collateral. The Repo "Sellers" (which were Lindberg-affiliated entities) used the cash obtained via the Repo agreements to purchase the collateral that purportedly secured PBLA's repurchase right. Stated differently, while under the Repo agreements, PBLA was purportedly acquiring the "Seller's right, title and interest in the Assets … [reflected] in Exhibit A," (emphasis in original), at the time of the transaction, the "Seller" had no "right, title, [or] interest" in the collateral identified in the agreement. Instead, the Seller used PBLA's cash to purchase the collateral purportedly securing the Repo.

109.    This scheme benefitted Lindberg to the detriment of PBLA. Instead of holding cash or a "cash equivalent," PBLA held hundreds of millions of illiquid assets. PBLA's counterparties to the Repos, which generally were Lindberg-affiliated entities, had no ability to repurchase within 90 days, which exposed PBLA, contrary to its investment guidelines, to significant risks and breached the PBLA Trust Agreement.

26

110. Even after a GBIG employee notified Lindberg that the Repos violated the reinsurance trust agreement and Puerto Rico insurance law, Lindberg continued to recommend, authorize, and direct PBLA to purchase Repos issued by Lindberg affiliates.

111. As a result, PBLA held hundreds of millions of illiquid securities.

**VII.  The NC Insurance Companies Are Placed into Rehabilitation.**

112. Lindberg's and Herwig's scheme to loot the NC Insurance Companies' assets contributed to those companies being placed into rehabilitation.

113. On June 27, 2019, the Commissioner of Insurance of the State of North Carolina ( "NC DOI Commissioner"), filed a Verified Petition For An Order of Rehabilitation ("Petition") for SNIC, BLIC, SNRC, and CBL.

114. In support of the Petition, the NC DOI Commissioner stated it had "developed reasonable concerns regarding whether [the NC Insurance Companies'] transactions among affiliates, subsidiaries, or controlling persons provided sufficient liquidity to assure [the NC Insurance Companies'] abilities to meet certain obligations" and that the "appointment of a rehabilitator [was] necessary to protect the [NC Insurance Companies'] policyholders."

115. The Boards of the NC Insurance Companies and Lindberg consented to the rehabilitation.

116. On June 27, 2019, the Wake County Superior Court issued an Order ("Rehabilitation Order") placing the NC Insurance Companies into rehabilitation and appointed the NC DOI Commissioner as rehabilitator for the NC Insurance Companies ("Rehabilitator"). The Rehabilitation Order authorized the Rehabilitator to, among other

27

things, control and direct all assets of the NC Insurance Companies and to control and conduct the NC Insurance Companies' business.

117. As of June 30, 2019, SNIC had approximately 61% of its assets invested in affiliated investments and CBL had 43% of its assets invested in affiliated investments. As of June 30, 2019, the NC Insurance Companies had ceased all new business.

118. As of the date of this filing, the NC Insurance Companies remain in rehabilitation.

**VIII. PBLA Files for Bankruptcy Protection.**

119. On April 15, 2019, the Bermuda Monetary Authority imposed conditions and directions on the insurance license of PBLA to assist in the enhanced supervision by the Bermuda Monetary Authority.

120. In or around May 2020, the Bermuda Monetary Authority became concerned about the solvency of PBLA and appointed Deloitte Ltd. as an independent party to review certain non-compliance and solvency issues related to PBLA.

121. On September 18, 2020, following Deloitte's report on the financial position of PBLA, the Bermuda Monetary Authority filed a petition on behalf of PBLA to the Supreme Court of Bermuda seeking, among other things, the winding up of PBLA and the appointment of a liquidator of PBLA. On September 25, 2020, the Supreme Court of Bermuda appointed Deloitte Ltd. as PBLA's Joint Provisional Liquidator ("JPL").

122. On December 3, 2020, the JPL filed a verified petition for relief under Chapter 15 of the U.S. Bankruptcy Code, seeking entry of an order recognizing provisional liquidation proceedings with respect to PBLA pending before the Supreme Court of Bermuda as a foreign main proceeding.

Case 1:22-cv-00715   Document 1   Filed 08/30/22   Page 28 of 32

# COUNT I

### *Violation of Sections 206(1) and 206(2) of the Advisers Act*
**(Against All Defendants)**

123.    The SEC re-alleges and incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124.    At all relevant times, Lindberg, Herwig, and SASL each acted as an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Defendants Lindberg, Herwig, and SASL owed the NC Insurance Companies and PBLA a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in the client's best interests at all times.

125.    As detailed in paragraphs 1 through 122 above, at all times alleged here, Defendants Lindberg, Herwig, and SASL, while acting as investment advisers, and in breach of their fiduciary duties, by use of mails and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully, or recklessly: (1) employed devices, schemes, and/or artifices to defraud a client or clients or prospective clients; and (2) engaged in transactions, practices, and/or courses of business which operated as a fraud or deceit upon a client or clients or prospective clients.

126.    By reasons of the foregoing, Defendants Lindberg, Herwig, and SASL have violated and, unless enjoined, will again violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

# COUNT II

### *Aiding and Abetting Violations of*
### *Sections 206(1) and (2) of the Advisers Act*
(Against Defendants Lindberg and Herwig)

127.    The SEC re-alleges and incorporates by reference paragraphs 1 through 126 as if fully set forth herein.

128.    Defendant SASL violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

129.    As a result of the conduct alleged herein, Defendants Lindberg and Herwig each aided and abetted Defendants SASL's violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly providing substantial assistance to SASL which, while acting as an investment adviser, by the use of the mails or by means or instrumentality of interstate commerce, directly or indirectly, knowingly, willfully, or recklessly: (a) employed a device, scheme, or artifice to defraud; or (b) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client, as more particularly described above.

130.    By virtue of the foregoing, Defendants Lindberg and Herwig, directly or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Find that the Defendants committed the violations alleged herein.

### II.

Issue permanent injunctive orders restraining and enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, from violating Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1), 80b-6(2)].

### III.

Order the Defendants to disgorge their ill-gotten gains, received as a result of the violations alleged in this Complaint, along with prejudgment interest.

### IV.

Order the Defendants to pay civil monetary penalties under Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as may be necessary and appropriate.


**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.



Dated: August 30, 2022           Respectfully submitted,


By:   /s/ Alyssa A. Qualls

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

Alyssa A. Qualls (QuallsA@sec.gov)
Kevin A. Wisniewski (Wisniewskik@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone:   (312) 353-3790
Facsimile: (312) 353-7398