# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>GREGORY E. LINDBERG, CHRISTOPHER HERWIG, AND STANDARD ADVISORY SERVICES LIMITED,<br><br>    Defendants. | Case No. 22-CV-715 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GREGORY E. LINDBERG'S MOTION TO DISMISS

### I.    Nature of the Matter before the Court

In the Complaint, the Securities and Exchange Commission ("SEC") attempts to portray the operations of a complex, sophisticated, and successful business as a violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("IAA"), but to no avail.  The SEC's conclusory allegations simply set forth various transactions undertaken by three North Carolina insurance companies, a North Carolina reinsurance company, and a Bermuda reinsurer.  The SEC then adds inflammatory, often inconsistent, language to further its effort to paint a negative picture of the ultimate owner of these entities—Greg E. Lindberg ("Lindberg").

Critically, the SEC concedes that Lindberg cannot be held liable for a primary violation of Section 206(1) or (2) because the Complaint fails to allege *any* facts that establish Lindberg was a registered investment advisor. Therefore, Count I should be dismissed in its entirety, with prejudice.

The SEC also recognizes that Lindberg did not have singular authority over any of these entities and provides *no* allegations of any fraudulent statements made, or concealed, by Lindberg. As a result, the Complaint fails to meet the heightened pleading standard for fraud set forth by Federal Rule of Civil Procedure 9(b). Beyond this heightened standard, the Complaint fails to allege Lindberg acted with scienter as required to state a claim under Section 206(1) of the IAA and fails to allege that Lindberg had, much less breached, any fiduciary duty as required to state a claim under Section 206(2).

For these reasons, and as set forth below, the SEC's claims against Lindberg fail and the Complaint should be dismissed in full, with prejudice.

## II. Background

In 1991, Lindberg founded Eli Global, a privately-held consortium of over 100 companies that employs around 7,500 individuals. Comp., ECF #1, ¶25.[1] Eli Global was an information and management services company that acquired and invested in insurance

---

[1] Lindberg strongly disputes the Complaint's portrayal of Eli Global's business activities and objects to any accusation or insinuation that he has violated any laws. Nonetheless, citations to factual statements are to the Complaint, or to other judicial filings of which Lindberg respectfully requests the Court take judicial notice, in accordance with the required legal standard under Rule 12(b)(6).

and annuities, healthcare, media, market intelligence, certification, accreditation, and other businesses. *Id.* The investment strategy that led to this success was simple: buy and hold. *See generally id.* ¶37.

In 2014, Eli Global added its first insurance company to the portfolio. *Id.* ¶28. Over the next three years, it acquired eight more insurance or reinsurance companies. *See generally id.* ¶¶23, 26-27, 29. Among these insurance companies were three North Carolina insurance companies (Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), and Colorado Bankers Life Insurance Company ("CBL")), a North Carolina reinsurance company (Southland National Reinsurance Corporation ("SNRC"), collectively, the "NC Insurance Companies"), and a Bermuda based insurance company that served as a reinsurance trust (Private Bankers Life & Annuity Co. ("PBLA")). *Id.* ¶¶23, 29.

These insurance companies each fell under the umbrella of Global Bankers Insurance Group ("GBIG"). *Id.* ¶26. GBIG was the overarching brand and management company for Eli Global's insurance operations. *Id.* ¶¶26, 33-34. GBIG provided asset management services as well as general managerial, financial, operational, and administrative support services to each of the NC Insurance Companies as well as to PBLA (among others). *See generally id.* To provide this extensive suite of services, GBIG was led by a separate executive team with over a half-century of experience in managing and operating insurance companies and which was supported by a staff of nearly one hundred professionals. GBIG's fees, including its asset management fees, were subject to the North

3

Carolina Department of Insurance's approval and were periodically approved by NC DOI. *See* N.C.G.S. § 58-19-30.

SASL was an investment advisor registered with the SEC from November 2016 to October 2019 and also obtained a license to provide investment advice from the Malta Financial Services Authority. Comp. ¶¶44, 49. SASL provided advice to a variety of insurance company clients, including European-based insurance companies that were wholly independent from Lindberg. *Id*. ¶49. Under its various agreements with GBIG, SASL was to provide investment advice and recommendations to GBIG, with GBIG maintaining the right to accept or reject these recommendations. *See generally id.* ¶¶33-34, 46. In turn, GBIG paid SASL advisory fees, based in part on the value and performance of assets under management, which were a subset of its own fees, all of which had previously been approved by NC DOI. *See* N.C.G.S. § 58-19-30.

### a. NC Insurance Companies

Between 2014 and 2017, Eli Global continued to pursue its investment strategy, both through GBIG and the NC Insurance Companies, as well as with non-insurance investments. *See generally* Comp. ¶¶28-37. These acquisitions and the day-to-day business of the NC Insurance Companies were managed by GBIG's executive management team and employees. *Id*. ¶34. Each NC Insurance Company had a five-member board of directors: a non-independent director, two independent directors, Lindberg, and Herwig. *Id*. ¶32. Each of the NC Insurance Company's board of directors ("Board") was required to approve all investments for their company. *See generally id.* ¶70.

4

Under North Carolina law, the NC Insurance Companies were required to receive approvals from the NC DOI's Commissioner if a prospective investment fell outside the company's typical investment profile. N.C.G.S § 58-10-440; Comp. ¶69. From the beginning of his work in the insurance industry, Lindberg worked closely with NC DOI to ensure his companies were operating in full compliance with all applicable regulations. N.C.G.S § 58-10-440; *see generally* Comp. ¶71. As a part of that process, NC DOI agreed, from the beginning, that each NC Insurance Company could invest up to 40% of its total admitted assets in affiliated debt. *Id.* With that approval, the NC Insurance Companies invested in new, long-term acquisitions under GBIG's management and direction and pursuant to SASL's investment recommendations. *See generally* Comp. ¶¶36-37, 46.

Initially, as recommended by NC DOI, a large portion of the NC Insurance Companies' investments were made through special-purpose vehicles ("SPVs"). N.C.G.S § 58-10-440; *see generally* Comp. ¶71. In fall 2017, NC DOI reassessed the NC Insurance Companies' investment portfolios and decided that the SPV loan structure, which it had initially approved, constituted a related-party transaction. Comp. ¶74. NC DOI therefore required that the NC Insurance Companies eliminate and/or reduce their investments in the SPV structures. *Id.* Although Lindberg disagreed with this determination, the companies complied with NC DOI's directive to unwind the SPV investments. *Id.*

Eli Global and GBIG analyzed various alternatives to unwind and restructure the underlying SPV loans—which were income-producing assets—from the SPVs. *Id.* ¶¶75-76. After consultation with GBIG leadership, the NC Insurance Companies decided to

5

utilize the Finance Company ("FinCo") structure, which included an initial equity contribution via the sale of preferred equity and a greater diversification of assets. *Id.*

NC DOI's directive to unwind and restructure the NC Insurance Companies' loans to the SPVs required repaying the ten-year notes in their entirety after only three years or less. *See id.* ¶¶28, 74. In other words, within three years of purchasing SPV debt, the NC Insurance Companies would receive the same amount they initially contemplated receiving over the course of ten years. Under the Statements of Statutory Accounting Practices ("SSAP") (which governs all insurance companies' accounting), this early repayment would have required the NC Insurance Companies to recognize significant capital gains. *See* SSAP 7.2. The applicable SSAP would have required these capital gains to be held in an Interest Maintenance Reserve ("IMR"). *Id.*

SSAP's IMR requirement presumes that the interest rate environment must have deteriorated for an insurance company to make a capital gain on the sale of a loan, which means it will cost more money for the insurance company to replace that income-producing asset. *Id.* However, the relevant SSAP does not contemplate the situation here—where a safe asset is forcibly disposed and replaced with another income-producing asset. *See generally id.*

Had the NC Insurance Companies been subject to SSAP's IMR requirement, it would have deprived the NC Insurance Companies, and their respective policyholders, of access to approximately $24.8 million for between eight-and-a-half to ten years. *See* Comp., Table 1. Thus, the roughly $24.8 million reflected in the November 2017

6

transactions would have been trapped at the NC Insurance Companies for years before it became available again. *Id.*

To avoid the IMR illiquidity trap, Academy Financial Assets, LLC ("AFA") was made a party to the SPV-to-FinCo restructuring transactions to ensure the NC Insurance Companies were made whole. *See id.* ¶81. Instead of losing the funds to an IMR, the capital gains from the transactions moved through AFA so the assets could more immediately benefit the policyholders. *Id.* For example, the funds AFA received in November 2017 were ultimately used to benefit the policyholders because the funds were ultimately paid back into GBIG as Additional Paid in Capital. *See generally id.* ¶83.

### b. PBLA

At all relevant times, PBLA had a reinsurance agreement with Universal Life Insurance Company ("ULICO") through which PBLA reinsured certain insurance policies underwritten by ULICO. *Id.* ¶¶23, 38-39. GBIG employees also managed PBLA's day-to-day operations for the vast majority of the relevant period. *Id.* ¶33. As part of its investment strategy, PBLA invested in certain notes issued by SPVs. *Id.* ¶92. Pursuant to the legal advice GBIG received at the time of the investments, these SPVs were not considered affiliated entities to Lindberg's companies under the relevant law. PBLA also entered into certain repurchase transactions ("repos") in order to authorize PBLA ULICO to invest in cash equivalent transactions. *Id.* ¶¶102-08.

7

### c. Related Litigation

#### 1. NC Insurance Companies MOU Litigation

In 2019, NC DOI proposed a plan for oversight of the NC Insurance Companies that was ultimately documented in a "Memorandum of Understanding" or "MOU." *See* 19 CVS 013093; *Southland National Insurance Company, et al, v. Greg E. Lindberg, et al.*; in the Superior Court Division; Wake County, North Carolina.[2] At the same time, Lindberg and all his affiliated entities that had issued debt to the NC Insurance Companies and PBLA entered into an Interim Loan Agreement ("ILA") to ensure that all of the NC Insurance Companies were repaid in full. *See,* 5:20-CV-00366-D; *Colorado Bankers Life Insurance Company v. AR Purchasing Solutions 2, LLC, et al.*; in the Eastern District of North Carolina, Western Division. At NC DOI's insistence, this ILA set forth a ten-year repayment schedule for Lindberg affiliated debt. *Id.* The MOU and the ILA have been the subject of extensive litigation in both North Carolina state and federal courts between NC DOI and Lindberg's companies since October 2019; however, there has been no dispute over the validity of the ILA's ten-year repayment schedule.[3]

---

[2] This litigation is referenced in the Complaint at paragraphs 113, 115-116, and 118. The Consent Order of Rehabilitation entered by the Wake County court as well as key pleadings in the litigation are available at: https://www.ncdoi.gov/insurance-industry/regulatory-actions-receiverships#SouthlandNationalInsuranceCorporationinRehabilitationColoradoBankersLifeInsuranceCompanyinRehabilitationBankersLifeInsuranceCompanyinRehabilitationSouthlandNationalReinsuranceCorporationinRehabilitation-919.

[3] *See, e.g.,* 5:20-CV-00367-D; *Southland National Insurance Corp. v. AR Purchasing Solutions, LLC;* in the Eastern District of North Carolina, Western Division; 5:20-CV-

## 2.     PBLA Bankruptcy Litigation

In September 2020, the Bermuda Monetary Authority ("BMA") filed proceedings to wind up PBLA, among other entities.  Comp. ¶121; *see also, In re PB Life and Annuity Co., Ltd*., et al., Case No. 20-12791 (LGB), ECF #4, ¶38 (Bankr. S.D.N.Y. 2020).  As part of that process, the Bermuda courts appointed the "Joint Provisional Liquidators" or "JPLs" over the Bermuda Insurance Companies, including PBLA.  Comp. ¶121.  In November 2020, the JPLs filed a Chapter 15 bankruptcy case for PBLA, among other entities.  Comp. ¶122; *see also In re PB Life and Annuity Co., Ltd*., et al., Case No. 20-12791 (LGB) (Bankr. S.D.N.Y. 2020).  As a part of that bankruptcy case, the JPLs have initiated sprawling litigation seeking the recovery of sufficient funds to, primarily, repay ULICO.  *Id.*

In January 2020, ULICO asserted that PBLA breached its reinsurance obligations by over-investing in Eli Global-related companies.  *PB Life & Annuity Co. Ltd. v. Universal Life Ins. Co*., Case No. 20-cv-2284, ECF #21-1 (S.D.N.Y. 2020).  ULICO initiated arbitration proceedings in Puerto Rico that resulted in a $524 million pre-judgment award against PBLA that was confirmed by the United Stated District Court for the Southern District of New York.  ULICO has continued its collection efforts against Lindberg individually in North Carolina federal courts.  *Universal Life Insurance Co. v. Greg Lindberg,* Case No. 20-cv-681 (M.D.N.C. 2020).

---

00368-D; *Colorado Bankers Life Insurance Company v. Forest Park Asset Management, LLC;* in the Eastern District of North Carolina, Western Division; 5:20-CV-00369-D.

## III. Legal Standards

### a. Pleading Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Johnson v. Smith*, 2020 WL 3846348, at *3 (M.D.N.C. July 8, 2020) *citing Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The complaint must give "the defendant fair notice of what the claim is and the grounds upon which it rests." *Id. citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In evaluating such a motion, "the court will consider the facts stated in the complaint, the documents attached thereto, and any relevant matters of public record." *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 629 (E.D. Va. 2003). "In securities fraud actions, courts will also examine 'the other information that was publicly available to reasonable investors at the time the defendant made statements the plaintiff [] alleged were fraudulent, including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely.'" *Id.*

In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b). Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Rule 9(b) requires that plaintiffs plead all of the elements of fraud with particularity. Particularity of pleading is required with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific

10

acts raising an inference of fraud—the 'who, what, where, why and when.'" *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 884 (W.D.N.C. 2001) *citing Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir.1999). Requiring particularity serves to give a defendant notice of the plaintiff's claim and safeguards a defendant's reputation from "improvident" charges. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Moreover, the complaint must "plead specific facts that satisfy the Rule 9(b) requirements as to each defendant." *SEC v. Blackburn*, 2015 WL 5307424, at *5 (E.D. La. Sept. 10, 2015) ("[l]ump[ing] all defendants together, failing to segregate the alleged wrongdoing of one from … another" does not satisfy Rule 9(b)); *SEC v. Cable/Tel Corp.*, 90 F.R.D. 662, 664 (S.D.N.Y. 1981) (dismissing complaint for failure to specify each defendant's particular role in the alleged fraud).

### b. Scienter under Section 206(1) of the IAA.

To allege a violation of Section 206(1) of the IAA a plaintiff must show that the defendant had the requisite scienter. *SEC v. Peters*, No. 5:17-CV-630-D, 2021 WL 1112387, at *6 (E.D.N.C. Mar. 22, 2021); *Dembski v. SEC*, 726 F. App'x 841, 844 (2d Cir. 2018) ("Scienter is required for a Section 206(1) violation but need not be found for a violation of Section[] 206(2)"). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Aaron v. SEC*, 446 U.S. 680, 686 n.5, 695-97 (1980). While recklessness can satisfy the scienter requirement, *see SEC v. Steadman*, 967 F.2d at 641-42, such conduct must be so extreme as to be "highly unreasonable" and depict "an extreme departure from the

11

standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)).

### c. Fiduciary Duty under IAA Section 206.

To establish a violation under sections 206(1) and (2) of the IAA, the SEC must show: (1) that the defendant is an investment advisor; (2) that the defendant engaged in fraudulent activities; and (3) that the defendant negligently breached his fiduciary duty by making false and misleading statements or omissions of material fact. *SEC. v. Gotchey*, 981 F.2d 1251 (4th Cir. 1992). Section 206 "established 'federal fiduciary standards' to govern the conduct of investment advisers," and as such, benefit the advisers' clients." *SEC v. Capital Gains Research Bureau, Inc.,* 426 U.S. 180, 194 (2014). Similarly, an investment adviser has "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts.'" *Id.*

## IV. Count I Should be Dismissed Because Lindberg is Not an Investment Adviser.

Only investment advisers can be held primarily liable for violations of Section 206 of the IAA. *See* 15 U.S.C. § 80b–6 (prohibiting conduct by "investment advisers"); *SEC. v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004); *Sullivan v. Chase Inv. Servs. of Boston*, Inc., 434 F. Supp. 171, 184–85 (N.D. Cal. 1977) (same). The IAA defines "investment adviser" as "any person who, for compensation engages in the business of advising others, either directly or through publications or writings, as to the

12

value of securities, or as to the advisability of investing in, purchasing, or selling securities…." 15 U.S.C. § 80b-2(a)(11). The IAA separately defines "person associated with investment advisors" as:

> any partner, officer, or director of such investment adviser (or any person performing similar functions), or any person directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser….

15 U.S.C. § 80b-2(a)(17). Crucially, "[p]erson[s] associated with investment advisers" cannot be primarily liable for violations of Section 206. *See PIMCO Advisors*, 341 F. Supp. 2d at 470 ("The SEC may not charge [executives] with violations of Section 206(1) or 206(2) directly, since they are not themselves investment advisers covered by the statutory provision."). Indeed, in *PIMCO*, the Southern District of New York dismissed primary liability claims against the Chief Executive Officers of three PIMCO advisors solely because they were not "themselves investment advisers." *Id*. Here, the Complaint alleges that Lindberg owned SASL, and investment advisor, and was a director and member of its investment committee. Comp. ¶¶18, 20. Thus, under the plain language of the IAA, Lindberg is, at most, a "person associated with an investment adviser" who cannot be held primarily liable for a violation of Section 206. Accordingly, Count I fails as a matter of law.

Even if this Court finds that Lindberg is not exempt from primary liability under Section 206 as a "person associated with an investment adviser," Count I nevertheless

should be dismissed because the SEC has failed to plausibly allege that Lindberg meets the statutory definition of an "investment adviser." To sufficiently plead that Lindberg was an investment adviser, the SEC must show that he: (1) was "in the business of" (2) "advising others" regarding securities investments; and (3) provided such advice in exchange "for compensation." *See* 15 U.S.C. § 80b-2(a)(11). Here, instead of adequately alleging any of these elements, the SEC relies on conclusory allegations that Lindberg "acted as [an] investment advisor[] … within the meaning of the [IAA]." Comp. ¶48.

## V. The Complaint Fails to Plead, with Particularity, that Lindberg Engaged in Any Fraudulent Behavior.

The SEC alleges that "the NC Insurance Companies *paid an unnecessary mark-up* that went directly to Lindberg." *Id.* ¶81. However, the Complaint contains *no* allegations that set forth *why* the amount paid to AFA was unnecessary nor how this went "directly" to Lindberg. In fact, as discussed *supra* at p. 7, AFA was included in the transaction for a specific purpose: to ensure that the NC Insurance Companies and the policyholders they serve were made whole rather than harmed by the impact of a technical accounting procedure.

The SEC initially recognizes that Lindberg only "*recommended* the purchase and sale of securities on behalf of" the NC Insurance Companies and PBLA. *Id.* ¶47. But then, the SEC suddenly contends that Lindberg "*authorized and approved*" the transactions. *Id.* ¶81. A few paragraphs later, the SEC again softens its language and maintains that Lindberg "*knew about and approved* all aspects of the four transactions." *Id.* ¶85. The

SEC does not even attempt to reconcile its inconsistencies on this allegation that purports to form the basis of the alleged fraud.

Further, the only support the SEC offers that Lindberg "knew about and approved" the transactions is that he signed a "Commitment Transaction Advice" memorandum on behalf of the NC Insurance Companies that "confirm[ed] their purchase of the … securities," signed bank closing documents and wire instructions authorizing the purchases and sales, and "signed several transactional documents (assignment and assumption agreements, security and loan agreements, etc.) to facilitate the SPV-to-FinCo conversions." *Id.* Notably, the Complaint lacks any detail as to what statements in these myriad legal, confirmation, and transaction documents were allegedly false or misleading. Nor does the Complaint even attempt to allege, much less allege with the requisite particularity, how Lindberg could have possibly known of any alleged falsity.

Indeed, the Complaint fails to adequately specify each of Lindberg, Herwig, and SASL's purported roles in the allegedly fraudulent schemes. Instead, the SEC impermissibly relies on group pleading, regularly repeating that some combination of the defendants jointly engaged in conduct without ever specifying which individual or entity inappropriately executed which document or made which incorrect statement. *See id.* ¶¶70, 73-74, 77, 80-81, 85-86, 90, 92-93, 95, 97-99, 103-106, 108 ("Lindberg and Herwig . . ."); ¶¶64, 72 ("Lindberg and/or Herwig . . ."); ¶¶2, 5, 8, 48, 89, 91, 100-101, 124-126 ("Lindberg, Herwig, and SASL"). Similarly, the Complaint fails to allege with sufficient particularity Lindberg's individual scienter and knowledge, instead blandly restating the

15

statutory language and claiming that all three defendants jointly violated the relevant provisions. *See id.* ¶¶123-130.

Finally, the SEC alleges that the PBLA investments and Repo agreements "clearly violated the PBLA Trust Agreement's prohibition against affiliated investments." *Id.* ¶96. But, the Complaint does not include any statements *by Lindberg* related to these investments and Repo agreements or any description about *why* any of Lindberg's actions were fraudulent.

For these reasons, the Complaint should be dismissed in its entirety.

## VI. The SEC Fails to Allege Scienter as Required Under Section 206(1) of the IAA.

The SEC alleges that Lindberg violated Section 206(1) of the IAA by "knowingly, willfully, or recklessly . . . engag[ing] in transactions, practices, and/or courses of business which operated as a fraud or deceit upon a client or clients or prospective clients." *Id.* ¶125. However, the SEC fails to allege a single fact in support of this conclusory allegation. For the reasons set forth below, the SEC's allegations fall far short of showing that Lindberg had the necessary "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12.

*First*, the SEC alleges no facts showing that Lindberg willingly or knowingly defrauded a client. The SEC alleges, amongst other things, that Lindberg, Herwig, and SASL "fraudulently diverted" advisory client funds and "failed to serve the best interests of their advisory clients." Comp. ¶8. However, the SEC alleged that GBIG managed the "day-to-day business of the NC Insurance Companies" and that Lindberg only had the

16

power to "recommend[] the purchase and sale of securities on behalf of" the NC Insurance Companies and PBLA, which necessarily means that some other individual or entity had to act on Lindberg's recommendations. *Id*. ¶¶33-34, 47. Despite this, the SEC does not allege that GBIG or its seasoned executives were unaware of the nature or ownership of AFA or its involvement in the FinCo transactions. Instead, the SEC makes conclusory allegations that are noticeably silent as to the party actually managing the NC Insurance Companies, which do not meet the pleading standard for willing and knowingly. *See id.*

*Second*, the SEC fails to allege facts showing recklessness. Again, the Complaint alleges that Lindberg "failed to serve the best interests of his clients." *Id.* But that is not enough to establish recklessness under Section 206(1). Indeed, "[t]he kind of recklessness required . . . is not merely a heightened form of ordinary negligence; it is an *extreme departure* from the standards of ordinary care." *SEC v. Peters*, No. 5:17-CV-630-D, 2021 WL 1112387, at *6 (E.D.N.C. Mar. 22, 2021); *SEC v. Moran*, 922 F. Supp. 867, 897 (S.D.N.Y. 1996) (same). By no means has the SEC pointed to any conduct amounting to an *extreme departure* from the standards of ordinary care. By assisting in facilitating the NC Insurance Companies' and PBLA's opportunities to make these investments, Lindberg intended to serve the best interests of the policyholders and any attempt by the SEC to otherwise reframe the character of these transactions through conclusory allegations should be rejected.

17

For these reasons, the SEC's allegations are not sufficient to state a valid cause of action under Section 206(1) of the IAA and Counts I and II, to the extent they allege violations of Section 206(1), should be dismissed.

## VII.    The SEC Fails to Allege that Lindberg Breached Any Fiduciary Duties.

The SEC's allegations that Lindberg breached his fiduciary duties to the NC Insurance Companies related to the FinCo Transactions and to PBLA related to the Affiliated Investments and Repos are insufficient to state a claim for violation of 206(1) and (2) of the IAA.  For the reasons set forth below, the Complaint should be dismissed with prejudice.

### a.    The SEC Fails to Allege that Lindberg Breached His Fiduciary Duties to the NC Insurance Companies Related to the FinCo Transactions.

The SEC's conclusory allegation that Lindberg "repeatedly recommended and entered into transactions that were not disclosed to and were not in the best interest of" the NC Insurance Companies has no basis.  Comp. ¶2.  First, inclusion of AFA in the SPV-to-FinCo restructuring transactions was in the best interest of the policyholders.  Second, SASL's client, GBIG, was aware of AFA and its involvement in the SPV-to-FinCo restructuring transactions.  Third, Lindberg had no legal duty to disclose the details of the SPV-to-FinCo restructuring transactions, or AFA's involvement, to the NC Insurance Companies because to the extent they were any party's advisory clients, they were clearly not Lindberg's advisory clients.

### 1. Inclusion of AFA in the SPV-to-FinCo transactions was in the best interest of the policyholders.

The SEC alleges that the relevant transactions "were not in the NC Insurance Companies' best interest and weakened the liquidity of the NC Insurance Companies." *Id.* ¶89. But, to reach that conclusion, the Complaint attempts to downplay two crucial facts: (1) the impact of NC DOI's requirement that the NC Insurance Companies sell the SPV loans; and (2) that the NC Insurance Companies were *repaid in full* for their original loans to the SPVs. *See generally id.* ¶¶74, 82. NC DOI's requirement was the sole basis for the FinCo transactions referenced in the Complaint. *See generally id.* ¶¶74-75. To be clear, NC DOI's decision—*not* Lindberg's—was the impetus for engaging in every transaction now the subject of the SEC's fraud-based allegations related to AFA. *Id.* By including AFA in the SPV-to-FinCo restructuring transactions, the NC Insurance Companies were able to comply with NC DOI's requirement to sell the SPV loans but avoid depriving policyholders of access to liquid capital gains generated as a result of having to prepay the NC Insurance Companies' loans.

Just as importantly, the Complaint attempts to ignore that the NC Insurance Companies were paid the full value of the SPV loans. That is, as a part of the transactions at issue, the NC Insurance Companies were paid the "book adjusted carrying value" "plus accrued interest," which was the value *recorded for these loans on the NC Insurance Companies' books. See id.* ¶82. Rather than engage with this fact, the SEC simply asserts that the NC Insurance Companies did not receive a capital gain from the sale of the SPV

19

notes. This ignores that, as alleged, the NC Insurance Companies actually received funds (the exact opposite of the liquidity weakening claimed in the Complaint).

As discussed above, *supra* pp. 6-7, SSAP 7.2 would require the NC Insurance Companies to hold the capital gain in an Interest Maintenance Reserve ("IMR"). Under SSAP 7.2, an IMR "defers recognition of realized capital gains and losses resulting from changes in the general level of interest rates." *See* SSAP 7.2. The purpose of an IMR is to minimize the effect that realized gains and losses arising from interest rate movements have on surplus capital, as well as to stabilize statutory surpluses, or gains, against fluctuations in the market value of securities as cash flows of assets and liabilities are matched. *Id.*

The presumption underlying an IMR is that if an insurance company makes a capital gain on the sale of a loan, that necessarily means that the interest rate environment has deteriorated and it will therefore cost more money for the insurance company to replace that income-producing asset. *Id.* SSAP, however, does not contemplate the situation here—a safe asset forcibly disposed. *See generally* SSAP 7. An IMR would lock-up the relevant funds for between seven to ten years. As a result, just from the November 2017 transactions, roughly $24.8 million reflected in the transactions would have been trapped at the NC Insurance Companies for up to ten years before it became available, in surplus or capital. *See* Comp. ¶82. Until then, it would essentially be inaccessible to the NC Insurance Companies to use for the benefit of their policyholders.

As a result, AFA was brought into the restructuring transactions to ensure that the NC Insurance Companies were made whole (that is, they were paid the carrying cost)

without unnecessarily trapping policyholder funds. The gains simply moved through AFA so that those funds could more immediately benefit the policyholders rather than be held in an IMR. Thus, the inclusion of AFA in the transactions *was* in the best interest of the NC Insurance Companies and the policyholders they served.

## 2. The SEC Does Not Allege that GBI was Unaware of AFA's Involvement

The SEC also asserts that the NC Insurance Companies were SASL's advisory clients. Comp. ¶55. This is incorrect. Section 206 of the IAA "established 'federal fiduciary standards' to govern the conduct of investment advisers," and as such, benefit *the advisers' clients*." *Capital Gains Research Bureau, Inc.,* 426 U.S. at 194 (emphasis added).

SASL's advisory client was GBIG, the NC Insurance Companies' parent company and manager. Comp. ¶¶33-34. Indeed, the SEC acknowledges that GBIG managed the "day-to-day business of the NC Insurance Companies" and that Lindberg only had the power to "recommend[] the purchase and sale of securities on behalf of" the NC Insurance Companies and PBLA, which necessarily means that some other individual or entity had to act on Lindberg's recommendations. *Id.* ¶¶33-34, 47. Despite this, the SEC does not allege that GBIG or its seasoned executives were unaware of the nature or ownership of AFA or its involvement in the FinCo transactions.

Because the NC Insurance Companies were not SASL's clients, SASL and Lindberg could not breach a fiduciary duty to the NC Insurance Companies as there was no adviser relationship between the parties.

21

### 3. Even if Lindberg did not disclose AFA or the details of the FinCo Transactions to the NC Insurance Companies, such disclosure was not required.

As explained above, the NC Insurance Companies were not SASL's client—GBIG was SASL's client. Therefore, to the extent that any disclosure obligation was owed with respect to AFA's relationship with Lindberg, much less, with respect to AFA's role in the FinCo Transactions, it was a duty owed by SASL to GBIG. *Capital Gains Research Bureau, Inc.,* 426 U.S. at 194. Noticeably absent from the Complaint is any allegation that GBIG was unaware of AFA's role in the subject transactions. Similarly lacking is any sufficiently alleged failure to disclose AFA's relationship with Lindberg.

### b. The SEC Fails to Allege that Lindberg Breached His Fiduciary Duties to PBLA related to Affiliated Investments and Repos.

Similarly, the SEC's conclusory allegation that Lindberg "repeatedly recommended and entered into transactions that were not disclosed to and were not in the best interest of" PBLA are insufficient. Comp. ¶2. Most importantly, as noted above in Section IV, Lindberg owed no fiduciary duties to PBLA because he was not a registered investment advisor.

However, even if the Court believes that the Complaint has sufficiently pled that Lindberg did owe fiduciary duties to PBLA, the Complaint still fails to establish a breach of any fiduciary duties to PBLA. The SEC does not allege at any point in 22 detailed paragraphs that Lindberg made a *single* false representation to PBLA that the investments forming the basis of the alleged violations were in compliance with the PBLA trust agreement, investment guidelines, and/or Puerto Rican law. *See generally* Comp. ¶¶90-

22

111. Nor does the SEC allege that Lindberg failed to disclose any facts to PBLA that would have allowed PBLA to draw those conclusions. *Id*. Instead, the SEC just makes conclusory allegations that Lindberg either advised, or recommended, or caused PBLA to make the investments at issue without in any way connecting the alleged violations of those investments with statements or omissions by Lindberg.

In addition, noticeably absent from the Complaint is a single allegation of any harm or loss suffered by PBLA. Comp. ¶90-111. Instead, the Complaint is rife with allegations that Lindberg "directed, authorized, and caused PBLA" to engage in various investment transactions that the SEC claims were in violation of a trust agreement, investment guidelines, and Puerto Rican Law. *See, e.g.*, Comp. ¶91. The Complaint nowhere alleges how Lindberg's actions with respect to PBLA violate any securities laws, nor that PBLA actually suffered any loss as a result of these actions. In fact, the SEC concedes that Lindberg poses no future harm to investors as PBLA is currently in bankruptcy proceedings after having been under "enhanced" regulatory supervision by the BMA since April 2019. Comp. ¶119-122. The SEC also concedes that any loss PBLA may have suffered is by definition uncertain as PBLA is in the midst of ongoing bankruptcy proceedings. *Id.*

For these reasons, the Court should dismiss Counts I and II to the extent they relate to the PBLA transactions and allow the PBLA bankruptcy process continue to work its way through the Southern District of New York for the benefit of the affected policyholders.

23

## VIII. The Court Should Dismiss or Strike the SEC's Claims for Monetary Penalties and Disgorgement.

Even if the Complaint is not dismissed, civil monetary penalties and disgorgement are entirely unwarranted here. There is nothing equitable in requiring cumulative, punitive penalties, after the NC Insurance Companies and PBLA have already sought resolution of any monetary dispute in other venues.

When seeking disgorgement, the SEC seeks to "remedy harm to the public at large," for violations "committed against the United States rather than an aggrieved individual." *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017). Because the purpose of disgorgement is to eliminate unjust enrichment in the public interest, disgorgement is not available where these claims are being—or already have been—adjudicated through other avenues. *E.g., S.E.C. v. ETS Payphones, Inc*., 408 F.3d 727, 735 (11th Cir. 2005) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)) ("the 'power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment'").

The NC Insurance Companies are currently subject to a Verified Petition for An Order of Rehabilitation filed by the NC DOI Commissioner in June 2019. Comp. ¶22. As part of the Petition, the NC DOI Commissioner controls and directs all assets of the NC Insurance Companies. *Id.* Further, Lindberg agreed to repay the repos, along with other affiliated debts, over the course of ten years through the ILA. The repos are also currently the subject of bankruptcy proceedings in the Southern District of New York that were

initiated in 2020. *See, In re: PB Life and Annuity Co., Ltd., et al.,* No. 20-cv-12791-lgb, Dkt. 173-2, p. 29 (Bankr. S.D.N.Y. March 28, 2022).

Finally, but importantly, under the terms of the relevant MOU and other litigation, all extracted funds will be returned to policyholders. On the other hand, any funds awarded to the SEC through this litigation go directly to the SEC—not policyholders—minimizing the funds available for policyholders to recover. Thus, civil monetary penalties and disgorgement are improper here where the allegedly injured parties have already sought redress in the courts *over two years ago.* As a result, Lindberg respectfully requests that the Court strike the prayer for such relief from the Complaint.

## IX. Conclusion

For the foregoing reasons, the SEC's claims fail as a matter of law and the Complaint should be dismissed with prejudice.

This the 31st day of October, 2022.

/s/ Allison Mullins
Allison Mullins
N.C. State Bar No. 23430
L. Cooper Harrell
N.C. State Bar No. 27875
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL &
    RUSSELL PLLC
300 North Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
amullins@turningpointlit.com
charrell@turningpointlit.com

25

OF COUNSEL:

Ryan J. Meyer
Barrett R. Howell
Katten Muchin Rosenman LLP
2121 N. Pearl Street, Suite 1100
Dallas, Texas 75201
Telephone:  214-765-3600
Facsimile:  214-765-3602

Michael J. Diver
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone:  312-902-5200
Facsimile:  312-902-1061

*Attorneys for Defendant Gregory E. Lindberg*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this action.

This the 31st day of October, 2022.

/s/ Allison Mullins
Allison Mullins