# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>GREG E. LINDBERG, CHRISTOPHER HERWIG, and STANDARD ADVISORY SERVICES LIMITED,<br><br>        Defendants. | Case No. 22-cv-715<br><br>Honorable Catherine E. Eagles<br>Magistrate Judge Joi Elizabeth Peake |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMMISSION'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS GREG LINDBERG AND STANDARD ADVISORY SERVICES LIMITED

Dated:  January 28, 2025

Alyssa A. Qualls (quallsa@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 886-0804

*Attorneys for Plaintiff United States Securities and Exchange Commission*

# TABLE OF CONTENTS

STATEMENT OF THE NATURE OF THE MATTER ....................................... 1

UNDISPUTED FACTS................................................................................. 2

    I.     Lindberg's Insurance Companies............................................. 2

          A. NC Insurance Companies ................................................. 2

          B.  PBLA.................................................................................. 3

    II.    Lindberg's Registered Investment Adviser SASL ..................... 5

    III.   Lindberg's First Fraudulent Scheme –
          The $57 Million Dollar FinCo Misappropriation...................... 8

    IV.   Lindberg's Second Fraudulent Scheme –
          The PBLA Illiquid Sham Repos ............................................. 13

    V.    The Fallout of Lindberg's Fraudulent Schemes ....................... 17

    VI.   Lindberg's Criminal Conspiracy to Commit Investment Adviser
          Fraud ...................................................................................... 18

STATEMENT OF THE QUESTIONS PRESENTED......................................... 19

STATEMENT OF THE ELEMENTS............................................................... 20

ARGUMENT.............................................................................................. 21

    I.     Summary Judgment Standard ................................................. 21

    II.    Lindberg and SASL Were Investment Advisers ...................... 21

    III.   Lindberg and SASL Violated Advisers Act Sections 206(1) and 206(2) ... 24

          A. The Multiple Criminal Pleas Establish
             Lindberg's and SASL's Advisers Act Liability ..................... 24

          B. Undisputed Facts Further Establish
             Lindberg's Advisers Act Violations...................................... 28

          C. Undisputed Facts Establish that SASL Violated the Advisers Act ...... 34

    IV.   Lindberg Aided and Abetted SASL's Advisers Act Violations ................ 35

CONCLUSION ......................................................................................... 36

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*Abrahamson v. Fleschner,*
 568 F.2d 862 (2d Cir. 1977), *overruled in part on other grounds by*
 *Transam. Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11 (1979) ................................. 20

*Adams v. Kinder–Morgan, Inc.,*
 340 F.3d 1083 (10th Cir.2003) ........................................................................ 34

*Echeverria v. Bank of Am., N.A.,*
 632 Fed. Appx. 1006 (11th Cir. 2015) ............................................................. 27

*Emich Motors Corp. v. General Motors Corp.,*
 340 U.S. 558 (1951) ........................................................................................ 25

*Fin. Planning Ass'n v. SEC,*
 482 F.3d 481 (D.C. Cir. 2007) ........................................................................ 20

*Krakauer v. Dish Network, LLC,* No. 1:14-CV-333,
 2017 WL 2242952 (M.D.N.C. May 22, 2017) ................................................. 34

*Maietta v. Artuz,*
 84 F.3d 100 (2d Cir. 1996) .............................................................................. 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986) ........................................................................................ 21

*In re Microsoft Corp. Antitrust Litig.,*
 355 F. 3d 322 (4th Cir. 2004) ......................................................................... 24

*New York v. Julius Nasso Concrete Corp.,*
 202 F.3d 82 (2d Cir. 2000) ............................................................................. 27

*Ottmann v. Hanger Orthopedic Group, Inc.,*
 353 F.3d 338 (4th Cir. 2003) .......................................................................... 32

*Ponce v. SEC,*
 345 F.3d 722 (9th Cir. 2003) .......................................................................... 35

*Robare Group, Ltd. v. SEC,*
 922 F.3d 468 (D.C. Cir. 2019) ............................................................... 21, 33

*Schatz v. Rosenberg,*
 943 F.2d 485 (4th Cir. 1991) .......................................................................... 35

*SEC v Nutmeg Group, LLC*,
  162 F. Supp. 3d 754 (N.D. Ill. 2016) ............................................................. 30

*SEC v. ABS Manager, LLC,* No. 13cv319-GPC (BGS),
  2014 WL 7272385 (S.D. Cal. Dec. 18, 2014) ................................................. 22

*SEC v. Ahmed*,
  308 F. Supp. 3d 628 (D. Conn. 2018) ..................................................... 22, 23

*SEC v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012) ........................................................................... 35

*SEC v. Bennett,* No. 8:17-cv-2453-PX,
  2022 WL 279826 (D. Md. Jan. 28, 2022) ....................................................... 25

*SEC v. Bilzerian*,
  29 F.3d 689 (D.C. Cir. 1994) .......................................................................... 25

*SEC v. Boucher,* No. 20-CV-1650 DMS (MSB)*,*
  2022 WL 17961486 (S.D. Cal. Feb. 8, 2022) ................................................. 30

*SEC v. Brown*,
  579 F. Supp. 2d 1228 (D. Minn. 2008), *aff'd* 658 F.3d 858 (8th Cir. 2011)........... 30

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963) ................................................................................. 20, 24

*SEC v. Causwave, Inc,* No. 1:15CV1068,
  2018 WL 4625407 (M.D.N.C. Sept. 26, 2018) ............................................... 34

*SEC v. Desai*,
  145 F. Supp. 3d 329 (D.N.J. 2015) ................................................................. 30

*SEC v. Familant*,
  910 F. Supp. 2d 83 (D.D.C. 2012) .................................................................. 35

*SEC v. Farkas*,
  557 Fed. Appx. 204 (4th Cir. 2014) ................................................................ 25

*SEC v. Genovese*,
  553 F. Supp. 3d 24 (S.D.N.Y. 2021) .............................................................. 25

*SEC v. Gotchey*, No. 91-CV-1855,
  1992 WL 385284 (4th Cir. Dec. 28, 1992) ..................................................... 26

*SEC v. Haarman*, No. A-21-CV-00235-LY*,*
  2022 WL 2782648 (W.D. Tex. Jan. 25, 2022) ........................................... 22, 23

iii

*SEC v. Haligiannis,*
    470 F. Supp. 2d 373 (S.D.N.Y. 2007) ............................................................ 34

*SEC v. Hilsenrath,* No. C 03–03252 WHA,
    2008 WL 2225709 (N.D. Cal. May 29, 2008) .................................................. 33

*SEC v. K.W. Brown & Co.,*
    555 F. Supp. 2d 1275 (S.D. Fla. 2007) ............................................................ 34

*SEC v. Kinetic Investment Group, LLC,* No. 8:20-cv-394-MSS-SPF,
    2024 WL 4869623 (M.D. Fla. Nov. 22, 2024) ......................................... 30, 32

*SEC v. Kokorich,*
    663 F. Supp. 3d 63 (D.D.C. 2023) ................................................................... 35

*SEC v. Lauer,* No., 03-80612-CIV,
    2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ................................................. 32

*SEC v. Laura,*
    680 F. Supp. 3d 204 (E.D.N.Y. 2023) ........................................................ 30-31

*SEC v. Morgan Keegan & Co., Inc.,*
    678 F.3d 1233 (11th Cir. 2012) ....................................................................... 34

*SEC v. Navellier & Assocs.,*
    108 F.4th 19 (1st Cir. 2024) ............................................................................. 32

*SEC v. Peters,* No. 5:17-CV-630-D,
    2021 WL 1112387 (E.D.N.C. Mar. 22, 2021) ......................................... *passim*

*SEC v. Pirate Investor, LLC,*
    580 F.3d 233 (4th Cir. 2009) ................................................................. 20-21, 32

*SEC v. Quinlan,* No. 02-cv-60082,
    2008 WL 4852904 (E.D. Mich. Nov. 7, 2008) ........................................... 25-26

*SEC v. Resnick,*
    604 F. Supp. 2d 773 (D. Md. 2009) ................................................................. 26

*SEC v. Wash. Invest. Network,*
    475 F.3d 392 (D.C. Cir. 2007) ........................................................................ 34

*SEC v. Welliver,* No. 11-CV-3076 (SER),
    2013 WL 12149244 (D. Minn. Apr. 30, 2013) ................................................ 32

*SEC v. Yuen,* No. CV 03-4376MRP (PLAX),
    2006 WL 1390828 (C.D. Cal. Mar. 16, 2006) ................................................ 21

*Superior Performers, Inc. v. Meaike,* No. 1:13CV1149,
  2014 WL 5819826 (M.D.N.C. Nov. 10, 2014) ........................................... 28, 34

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ...................................................................... 27

*United States v. Automated Medical Laboratories, Inc.,*
  770 F.2d 399 (4th Cir. 1985) ...................................................... 28, 34

*United States v. Elliott,*
  62 F.3d 1304 (11th Cir. 1995) ........................................................ 22

**Federal Statutes**

15 U.S.C. § 80b-2(a)(11), Investment Advisers Act of 1940, Section 202(a)(11) ..... 20

15 U.S.C. § 80b-6(1), Investment Advisers Act of 1940, Section 206(1)............*passim*

15 U.S.C. § 80b-6(2), Investment Advisers Act of 1940, Section 206(2) ...........*passim*

15 U.S.C. § 80b-9(f), Investment Advisers Act of 1940, Section 209(f) ................. 35

**Rules**

17 C.F.R. § 275.204-3 ............................................................................ 5

17 C.F.R. § 275.204-3(b)(3) ............................................................... 23

Fed. R. Civ. P. 56(a) ............................................................................ 21

**Other**

U.S.S.G. § 2B1.1(b)(20)(A)(iii).......................................................... 23, 27

## STATEMENT OF THE NATURE OF THE MATTER

The federal securities laws impose a fiduciary duty upon investment advisers to always act in the best interest of their clients and to disclose conflicts of interest. The undisputed facts show that, from July 2017 through 2018, Defendants Greg Lindberg ("Lindberg"), Christopher Herwig ("Herwig"), and Lindberg's Malta-based investment adviser Standard Advisory Services Limited ("SASL"), intentionally, or at minimum recklessly, disregarded this essential obligation by devising multiple schemes to defraud their advisory clients. The schemes involved many entities, lots of acronyms, and complicated transactions. But, at bottom, Lindberg used his investment adviser SASL to steal the vast cash reserves of client insurance companies to support his various other business ventures.

In one scheme, Lindberg and Herwig, a SASL executive and director, advised their clients to invest in a series of illogical and complex sets of transactions to mask Lindberg's misappropriation of $57 million dollars. In another scheme, they advised a client to invest in highly illiquid, prohibited securities issued by Lindberg's businesses. Both schemes placed Lindberg's interests ahead of his clients' interest and funneled hundreds of millions of dollars of client assets to Lindberg and his affiliated businesses. To add insult to injury, Lindberg required his client insurance companies to pay SASL more than $21 million in advisory fees as compensation for his fraud.

After the SEC filed this lawsuit, Lindberg and Herwig (along with another member of their scheme) were criminally charged and convicted for the same conduct charged here. Each admitted to "knowingly and willfully" engaging in a

conspiracy to violate Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act")—the same claims at issue here—by engaging in the same circular and illogical sets of transactions and by making the same "materially false" and misleading statements and omissions as alleged in the SEC's complaint.

Their criminal pleas make this a straightforward summary judgment decision, regardless of the complex (but undisputed) facts. As a result of Lindberg's and Herwig's convictions, principles of collateral estoppel prevent Lindberg and SASL from re-litigating their liability for the SEC's Advisers Act claims. Moreover, the undisputed facts show that the SEC is entitled to summary judgment.

## UNDISPUTED FACTS

### I. Lindberg's Insurance Companies

#### A. NC Insurance Companies

In or around 2014, Lindberg began acquiring North Carolina insurance companies (the "NC Insurance Companies"). (Lindberg Answer_ECF33 ¶¶28-29.) Lindberg is the NC Insurance Companies' ultimate owner. (*Id.* ¶¶28-29.) From 2017 through 2018, Lindberg and Herwig were board members of the NC Insurance Companies and members of their Investment Committee. (*Id.* ¶32; Herwig Am. Answer_ECF38 ¶32.)

Their day-to-day administrative functions were carried out by employees of Global Bankers Insurance Group, LLC ("GBIG"), which Lindberg also owned.

2

(Lindberg Answer ¶¶33-34; Exhibit ("EX") 17,[1] Stewart Dep. 199-200.) GBIG did not manage or make investment decisions for the NC Insurance Companies. (EX15, Herwig Dep. I:85, 93, 95; EX18, Stewart Dep. 291-292, 295-296; EX19, Hensley Dep. 46, 189.) Lindberg and Herwig, along with others under their control, dictated, controlled, and managed the investment decisions made by the NC Insurance Companies. (EX15, Herwig Dep. I:6-64, 74-76, 78-79, 82-84, 86-87, 89-90; EX18, Stewart Dep. 291; EX19, Hensley Dep. 78, 190-195, 198-200; EX21, Solow Dep. 323.)

Each NC Insurance Company maintained a written investment policy and investment guidelines. (Herwig Am. Answer ¶¶36-37; *see, e.g.*, EX59, CBL Investment Policy.) The NC Insurance Companies' board of directors, which included two independent members, approved all investments on a retroactive basis; meaning at quarterly board meetings, they approved the purchases and sales of assets made by the NC Insurance Companies in the previous quarter as directed by Lindberg and Herwig. (EX12, Cromartie Dep. 117; EX14, Crawford Dep. 154-157; EX15, Herwig Dep. I:123-125.)

**B. PBLA**

Private Bankers Life and Annuity Co., Ltd. ("PBLA") is a Bermuda based insurance company, which is beneficially owned by Lindberg. (Lindberg Answer ¶¶23, 38; Herwig Am. Answer ¶23.) In or around June 2017, PBLA entered into a

---

[1] The SEC has filed a supporting Appendix, Volumes I and II, attaching all Exhibits ("EX_") referenced herein.

reinsurance agreement and reinsurance trust agreement with Universal Life Insurance Company ("ULICO"). (Lindberg Answer ¶38.)

Under the reinsurance trust agreement ("ULICO Trust Agreement"), a trust account was created for the sole use and benefit of ULICO ("2017 ULICO Trust"). (EX39, ULICO Trust Agreement at EGL-SEC-241100.) Under the ULICO Trust Agreement, PBLA agreed that only "Qualifying Trust Assets" would be held in the 2017 ULICO Trust. The term "Qualifying Trust Assets" was defined as "cash … and investments permitted by the Puerto Rico Insurance Code; provided, however, that such investments are issued by an institution that is not the parent, a subsidiary or an affiliate of either [ULICO or PBLA]." (*Id.* at EGL-SEC-241102.) PBLA also agreed to manage the assets in the 2017 ULICO Trust in accordance with the Investment Guidelines set forth in the agreement. The Investment Guidelines required assets in the trust to be "always in compliance with all applicable regulatory requirements including but not limited to [Chapter 6 of the Insurance Code of Puerto Rico ("Chapter 6")]." (*Id.*, Ex. A, at EGL-SEC-241116.)

Lindberg and Herwig managed and controlled the investments made by PBLA. (EX15, Herwig Dep. I:74-76; EX16, Brown Dep. 117-19, 123, 125; EX17, Stewart Dep. 193; EX21, Solow Dep. 324, 428-429, 445, 505-08; EX25, *ULICO v. Lindberg*, No. 20-cv-681 (M.D.N.C.), Sept. 21, 2021, Brian Stewart Dep. 67-68; EX26, *ULICO v. Lindberg*, No. 20-cv-681 (M.D.N.C.), Sept. 27, 2021 Paul Brown Dep. 42, 66, 68.)

## II. Lindberg's Registered Investment Adviser SASL

Lindberg created SASL in February 2016 to provide investment advisory services to his affiliated insurance companies and to third parties. (EX30, 2018 SASL ADV Forms at ELI-DOJ-0447647; SASL Answer_ECF40 ¶43.) Lindberg owned and controlled SASL, (EX30, 2018 SASL ADV Forms at ELI-DOJ-0447647), and from 2017 through 2018 he was a director of SASL and a member of SASL's investment committee. (Lindberg Answer ¶18; SASL Answer ¶18.) In 2017 through 2018, Herwig was a director of SASL, a member of SASL's investment committee, and SASL's portfolio manager. (Herwig Am. Answer ¶19; SASL Answer ¶19.)

SASL was an SEC-registered investment adviser from November 2016 to October 2019. (SASL Answer ¶44.) Each year SASL was required to provide its advisory clients with a brochure supplement ("Brochure Supplement"). *See* 17 C.F.R § 275.204-3. (EX30, 2018 SASL ADV; EX28, 2017 SASL ADV.) SASL's Brochure Supplement identified all "Supervised Persons" of SASL who provided investment advice to its clients. SASL's 2017 and 2018 Brochure Supplement identified Lindberg and Herwig as "Supervised Persons" of SASL and explained that Lindberg "benefit[ted] from SASL's provision of investment advisory services through his indirect ownership of SASL." (EX30, 2018 SASL ADV at ELI-DOJ-0447671-73; EX28, 2017 SASL ADV at ELI-DOJ-1288675-77, 84-86.) Lindberg knew he was a Supervised Person and identified as such in SASL's Brochure Supplement. (EX29, Mar. 13, 2018 Email to Lindberg attaching SASL ADV Part 2B.)

SASL's Compliance Manual stated that SASL and its Supervised Persons owed clients a "fiduciary duty," which "require[d] its employees to place the interests of clients before their own and to avoid conflicts of interest or even the appearance of a conflict of interest." (EX27, SASL Compliance Manual at SASL_4717, 4732, 4760; SASL Answer ¶¶51-54.)

Lindberg directed the NC Insurance Companies and PBLA to use SASL as their investment adviser. (Herwig Am. Answer ¶¶45-46.) From as least March 2017 through 2018, SASL provided investment advisory services to the NC Insurance Companies pursuant to written Investment Advisory Services Agreements ("NC IA Agreements"). (EX33, NC IA Agreements.) The NC IA Agreements, which were between SASL and GBIG, identified the NC Insurance Companies as SASL's "client" and governed the investment advisory services SASL provided them. (*Id.* at SASL_006437 (Section 3(c)), _006306 (11.1(f)), _006416 (11.1(f)), _006240 (11.1(f).) Specifically, SASL was retained to, among other things, "provid[e] securities investment advice regarding all of [the NC Insurance Companies'] investments" (*Id.* at SASL_006432 (Section 2(a)), and to "advise and make recommendations on the Investments to be made by [the NC Insurance Companies]." (*Id.* at SASL_006432 (Section 2(a)), _006300 (Section 2.4 ("provide advice and recommendations to the Client")), _006409 (same), _006233 (Section 2.3).) In certain quarterly and annual financial statements, the NC Insurance Companies identified SASL as their investment adviser. (*See, e.g.*, EX54, CBL Q2_2018_Quarterly Statement at WM193798; EX56, BLIC 2018_Annual_Statement at ELI-DOJ-2682619.)

6

In exchange for providing investment advisory services, the NC Insurance Companies paid SASL advisory fees based on a percentage of the NC Insurance Companies' total investments. (EX33, NC IA Agreements at SASL_006437, _006315, _006426, _006251; EX23, SASL 30(b)(6) Dep. 68-69.) For advisory services rendered to the NC Insurance Companies from Q4 2017 through Q3 2018, SASL received $19,424,120.77 in advisory fees. (EX32, SASL NC Insurance Companies Invoices; EX23, SASL 30(b)(6) Dep. 143-148.) Under the NC IA Agreements, GBIG paid the advisory fees to SASL and then was reimbursed by the NC Insurance Companies for those payments because the "advisory services that SASL provided were for the benefit of the [NC] insurance companies." (EX18, Stewart Dep. 284–285.)

Throughout 2018, SASL provided investment advisory services to PBLA pursuant to written Investment Advisory Services Agreements ("PBLA IA Agreements"). (Herwig Am. Answer ¶46; SASL Answer ¶46; EX34, PBLA IA Agreements.) Under the PBLA IA Agreements, SASL, which was PBLA's "exclusive provider of investment advisory services," was retained to, among other things, "advise and make recommendations on the investments to be made by [PBLA] in respect of the Portfolio and the timing of purchases and sales of the investments comprised in the Portfolio." (EX34, PBLA IA Agreements at SASL_006323, _006324 (Section 4.1), _006513, _006514 (Section 4.1).) In exchange, SASL was paid advisory fees based on a percentage of PBLA's total investments. (SASL Answer ¶58; EX34, PBLA IA Agreements at SASL_006338, _006529.) For

7

investment advisory services rendered from June 2017 through 2018, PBLA paid SASL approximately $5,938,421 in advisory fees. (SASL Answer ¶61.)

In 2017 and 2018, SASL made numerous loans to Lindberg-affiliated entities exceeding $33 million dollars. (SASL Answer ¶¶ 63-64.) In 2018 and 2019, SASL issued dividends exceeding $12 million to its parent, another Malta company owned by Lindberg. (SASL Answer ¶¶ 66-68.)

## III. Lindberg's First Fraudulent Scheme—The $57 Million Dollar FinCo Misappropriation

Lindberg, Herwig, and Devin Solow, V.P. of Investments for another Lindberg affiliate, have each admitted engaging in a conspiracy to commit investment adviser fraud. They thus admitted to illegally directing circular transactions among Lindberg's web of entities using the funds of Lindberg's insurance companies to conceal Lindberg's use of these funds for his own benefit and to defraud numerous third parties, including the NC Insurance Companies. (EX3, Lindberg Factual Basis ("LFB") ¶¶3, 5; EX5, Herwig Factual Basis ("HFB") ¶¶6-9; EX6, Solow Bill of Information ("SBI") ¶¶6, 13-14.) In one scheme, Lindberg and Herwig misappropriated $55[2] million from the NC Insurance Companies by advising them to sell their interest in certain special purpose vehicles ("SPVs") and then immediately repurchase essentially the same investments through a different vehicle at a higher price. (EX5, HFB ¶9.b; EX6, SBI ¶14.b.)

---

[2] According to the SEC's calculation, $57 million was misappropriated. (EX60, FinCo Closing Instructions; EX35, Merrill Expert Report ¶134.) That difference is immaterial here.

In 2017, the NC Insurance Companies held millions of dollars of investments in notes issued by Lindberg-affiliated SPVs. (Lindberg Answer ¶73; EX35, Merrill Expert Report ¶¶77, 103.) In Fall 2017, the North Carolina Department of Insurance ("NCDOI") raised concerns over the amount and level of SPV investments, which NCDOI considered to be affiliated investments because the proceeds went directly to Lindberg and his affiliated entities. (Herwig Am. Answer ¶74; EX21, Solow Dep. 317, 320-321.) Although Lindberg objected to NCDOI's findings, he agreed to reduce the SPV investments. (Lindberg Answer ¶¶74-75.)

Lindberg, Herwig, and Solow decided to convert the SPV investments to a new investment structure, referred to as finance companies ("FinCos"), that purportedly would decrease the amount of affiliated investments on the NC Insurance Companies' balance sheet (the "SPV-to-FinCo Conversions"). (EX13, Powley Decl. ¶¶14, 16, 19-20; EX20, Solow Dep. 274; EX5, HFB ¶9.b; EX15, Herwig Dep. I:97-98.) Lindberg told Solow that the FinCo structure had been approved by NCDOI. (EX21, Solow Dep. 310-11.)

In connection with these SPV-to-FinCo Conversions, Lindberg, Herwig, and Solow devised a scheme to misappropriate funds from the NC Insurance Companies. They also falsely and misleadingly represented to NCDOI, ratings agencies, the NC Insurance Companies, GBIG executives, and others that these FinCo investments would be: (a) unaffiliated; (b) amply capitalized; (c) managed by an independent third party; and (d) outside of Lindberg's control. (EX5, HFB ¶¶9.b, 10; EX15, Herwig Dep. I:115, 246-250; EX21, Solow Dep. 304-06, 308-13, 360-61; EX6, SBI

9

¶¶14.b, 15; *see also, e.g.,* EX61, FinCo Offering Memos at VISTA0006248-49, ELI-DOJ-2617269, 2617271, 1915147-48; EX36, Herwig NCDOI Letter; EX38, Jan. 16, 2017 Solow email to NCDOI, ELI-DOJ-0046993-995.) In reality, Lindberg controlled the FinCos and Herwig and Solow served as their portfolio managers. (EX5, HFB ¶10; EX15, Herwig Dep. I:117-119, 244; EX21, Solow Dep. 358-361; EX6, SBI ¶15; EX13, Powley Decl. ¶26; Bostic Non-Prosecution Agreement_ECF80-3, Ex. A Statement of Facts ("BSF") ¶4 (filed under seal per Court Order, ECF101.)

As originally structured, the FinCos were to purchase the loans underlying the SPVs directly from the SPVs, or where applicable, directly from the NC Insurance Companies. (EX21, Solow Dep. 395-396; EX40, Oct. 31, 2017 Powley Email at ELI-DOJ-0487319; EX13, Powley Decl. ¶29.) If purchased directly from the SPV, the SPV would then prepay its obligation to the NC Insurance Companies. Either way, the FinCo directly purchased the underlying loans. (EX13, Powley Decl. ¶29.)

Five days before the first FinCo, SAM, closed, the steps to complete the SPV-to-FinCo Conversions changed. Instead of the FinCos directly buying the underlying loans, "[n]ow, AFA will be buying the SPV loan from [the NC Insurance Companies], then [the FinCo] buys the underlying loans from the SPV, then the SPV pays back the debt to AFA." (EX41, Nov. 3, 2017 Powley Email; *see also* EX21, Solow Dep. 400-401; EX13, Powley Decl. ¶¶30-33; EX24, Herwig Dep. III:29-32.) Lindberg owned "AFA," Academy Financial Assets, LLC, and had full control over AFA's assets. (EX47, 2017 AFA Offering Memo at ELI-DOJ-0822575, 822577;

EX37, AFA Certification at ELI-DOJ-0849247; Lindberg Answer ¶27; EX15, Herwig Dep. I:41, 240-241, 259.) AFA provided no services in connection with the Conversions. (EX21, Solow Dep. 315-316, 380; EX13, Powley Decl. ¶33.) Solow explained that AFA was inserted as an intermediary step for the sole purpose of "get[ting] capital into AFA" as unrestricted funds so Lindberg could free-up cash to fund transactions unrelated to the NC Insurance Companies. (EX21, Solow Dep. 315-316, 380-382, 386.) Only Herwig, Lindberg, and Solow had the authority to alter the structure of the SPV-to-FinCo Conversions. (EX15, Herwig Dep. I: 268; EX13, Powley Decl. ¶31.)

Between November 2017 and June 2018, Lindberg and Herwig caused the NC Insurance Companies to enter into thirteen (13) SPV-to-FinCo Conversions totaling more than $338 million, all using AFA as an intermediary. Each Conversion involved four steps. *First*, the NC Insurance Companies sold their interests in the SPVs to AFA at book adjusted carrying value ("BACV"). *Second*, the NC Insurance Companies purchased a note issued by a FinCo. *Third*, the FinCo took that money and purchased from each SPV the loan underlying the SPV at par—which was greater than BACV. *Fourth*, the SPV distributed the "par" purchase price received from FinCo to AFA. (*See* EX60, FinCo Closing Instructions (Steps 1-11, with Steps 9-11 reflecting BACV vs. par price); *see also* EX15, Herwig Dep. I:254-256; EX24, Herwig Dep. III:48-49.) In other words, the NC Insurance Companies sold their investment in an SPV, which made a loan to company X, in exchange for purchasing an investment in a FinCo, which made loans to companies X, Y, and Z, at an

11

*inflated price*. AFA pocketed the difference between BACV and par on the 13 transactions, yielding more than $57 million in "profit." (EX35, Merrill Expert Report ¶134; *see also* EX5, HFB ¶9.b; EX15, Herwig Dep. I:238-241; EX21, Solow Dep. 376-378.) Lindberg used AFA's "profits" to fund his other ventures. (Herwig Am. Answer ¶¶86-87; EX15, Herwig Dep. I:258-259.) The purpose of the misappropriation was to fund the acquisition and operation of Lindberg's other non-insurance company businesses. (EX5, HFB ¶9.b; EX6, SBI ¶14.b.)

Lindberg and Herwig were involved in all aspects of the SPV-to-FinCo Conversions. Each signed "Commitment Transaction Advice" ("CTAs") memos authorizing the NC Insurance Companies' investments in the FinCos. (*See, e.g.*, EX46, FinCo CTAs.) Lindberg executed numerous agreements, on behalf of all parties, transferring the SPV investments to AFA. (*See, e.g.*, EX43, Nov. 8, 2017 SAM LSA, at Regions_09.16.2019SECSubpoena_000854578; EX42, Nov. 8, 2017 SAM Assignment and Assumption Agreement, at EGL-SEC-392712-13.) Lindberg, on behalf of the FinCos, signed bank closing instructions authorizing the purchases and sales involved in each SPV-to-FinCo Conversion. (*See, e.g.*, EX60, FinCo Closing Instructions at WM106664, 107750, 197078, 102082.) Herwig signed certain "Investment Recommendation" letters recommending the NC Insurance Companies to invest tens of millions of dollars in the FinCo Notes. (*See, e.g.*, EX31, SASL Recommendation Letters at SASL_017247, _017285.)

On November 9, 2017, one day after the first FinCo closed, Lindberg received an accounting of "AFA[']s Profit" from the SPV-to-FinCo Conversions, detailing

how AFA obtained its profits: the difference between (1) "AFA Buying SPV Loan at BACV+interest," and (2) "SPV Payment to AFA" at par. (EX44, Nov. 9, 2017 Powley Email to Lindberg.) On November 21, 2017, Lindberg requested and again received a "breakdown and total of AFA profit per FinCo deal." (EX45, Nov. 21, 2017 Powley Email to Lindberg.) Lindberg also directed the FinCos, which were capitalized with NC Insurance Companies money, to fund and refinance residential real estate purchases by Lindberg. (EX5, HFB ¶9.b; EX6, SBI ¶14.b.)

Dr. Craig Merrill, an SEC expert witness, opined that inserting AFA into the SPV-to-FinCo Conversions: (a) served no economic purpose from the perspective of the NC Insurance Companies; and (b) appears to be a form of regulatory arbitrage to convince regulators that the NC Insurance Companies had reduced their affiliated investments. (EX35, Merrill Expert Report ¶¶174-200.)

Lindberg and Herwig did not disclose to the NC Insurance Companies' Boards of Directors AFA's role or involvement in the SPV-to-FinCo Conversions (*See* Herwig Am. Answer ¶88; EX17, Stewart Dep. 160-161; EX20, Solow Dep. 250-251.) And Lindberg did not disclose to the Board that AFA, an entity he owned and controlled, obtained more than $57 million of "profit" in connection with the 13 SPV-to-FinCo Conversions. (*Id.*)

## IV. Lindberg's Second Fraudulent Scheme—The PBLA Illiquid Sham Repos

In January 2018, Lindberg and Herwig devised a second scheme to extract millions of dollars of cash from the 2017 ULICO Trust to finance the growth of Lindberg's other businesses using approximately $161 million in prohibited and

13

sham repurchase agreements ("Repos") between PBLA and Lindberg-affiliated entities. (EX5, HFB ¶9.d; EX6, SBI ¶14.d; BSF ¶¶9-18; EX35, Merrill Expert Report ¶¶154, 159.) A Repo is form of short-term financing under which PBLA sent millions of dollars of cash to the Repo seller (a Lindberg affiliate) and in exchange, purportedly received an interest in certain collateral and a promise that the seller would repurchase that interest in a fixed period, at a slightly higher price. These Repos violated PBLA's Investment Guidelines and deceived ULICO and others about the true nature of assets in the 2017 ULICO Trust.

Specifically, in January 2018, Lindberg and Herwig caused PBLA to enter into 12 Repos totaling approximately $161 million with various Lindberg-affiliated entities (the "Repos"). PBLA's Investments Guidelines authorized PBLA to invest in "cash equivalents," but required that all investments in the 2017 ULICO Trust comply with Puerto Rico Insurance Code Chapter 6. (EX39, ULICO Trust Agreement, at EGL-SEC-241116-19.) Lindberg and Herwig knew of that requirement. (EX15, Herwig Dep. I:144-145.) Chapter 6 defined "cash equivalents" as "... short term investments or stocks of high credit classification and great liquidity, easily convertible into known amounts of cash ... with a maturity term of **_ninety (90) days or less_**." (*See* EX58, 26 L.P.R.A. § 648(21) (emphasis added).) Lindberg was also familiar with Chapter 6's definition of a "cash equivalent." (EX21, Solow Dep. 531-532.)

On their face, the Repos had 90-day maturity terms and were secured by adequate underlying collateral. (EX48, Repo Agreements at ELI-DOJ-1915790,

14

1202699, 1697322, 334587, 2523049, *etc.*) In quarterly "portfolio reports" sent to ULICO, PBLA reported the Repos as "cash equivalents." (*See, e.g.*, EX62, ULICO Reporting Packages; EX5, HFB ¶9.d; EX6, SBI ¶14.d; BSF ¶¶13-14.) And PBLA periodically "certif[ied]" or "validate[d]" to ULICO that all investments in the 2017 ULICO Trust complied with PBLA's Investment Guidelines. (EX55, Dec. 17, 2018 Herwig Letter to ULICO; EX57, Feb. 20, 2019 Compliance Certification.)

Lindberg signed every Repo agreement on behalf of ***both*** PBLA and his affiliated counterparty. (EX48, Repo Agreements, at ELI-DOJ-1915792, 1202701, *etc.*) Lindberg and Herwig facilitated and approved the Repos by, among other things, signing the Repo agreements, the closing instructions, the amendments to the Repos, and the wire instructions to close the transactions. (EX51, Repo CTAs; EX48, Repo Agreements, at ELI-DOJ-1915792, 1202701, *etc.*; *see also, e.g.*, EX50 Repo Wire Instructions, at ELI-DOJ-0334548, 0333932, WM114083; EX52, Jan. 24, 2018 Closing and Wire Instructions; EX53, Jan. 2018 Wilmington Trust Account 122841 (evidencing Repos purchased from 2017 ULICO Trust); EX15, Herwig Dep. I: 214.)

Lindberg and Herwig approved the Repos knowing they violated the ULICO Trust Agreement and PBLA's Investment Guidelines and knowing they exposed PBLA to greater risk, including exchanging hundreds of millions of dollars of cash for illiquid affiliated investments. (EX5, HFB ¶9.d; EX6, SBI ¶14.d; BSF ¶¶9-18.) The Repos were sham investments for three reasons. *First*, they were not intended to be, and were not in fact, repaid within 90 days. (EX5, HFB ¶9.d; EX15, Herwig Dep.

I:189; EX6, SBI ¶14.d; EX21, Solow Dep. 544-45; BSF ¶9.) Rather, Lindberg instructed Solow to "[b]asically keep rolling them over if nobody is asking any questions." (EX21, Solow Dep. 545.) Lindberg and Herwig caused the Repos to be amended on four occasions, extending their maturity terms to 180, 270, 360, and 450 days, respectively. (EX49, Jan. 2018 Repos Amendments, ELI-DOJ-1678618, 1678842, 2359432, 1678624, 1688508, 1672382, 1045123, 1667064, 1667540.) Even though the Repos no longer had 90-day terms, PBLA continued to falsely report them to ULICO as "cash equivalents." (*See, e.g.*, EX62, ULICO Reporting Packages.)

*Second*, the Lindberg-affiliated entities that were counterparties to the Repos did not have sufficient cash or capital on hand to "repurchase" the Repos within the 90-day maturity term. Instead, they used the proceeds of the Repos to assist Lindberg's planned acquisition of another insurance company. (EX5, HFB ¶9.d; EX15, Herwig Dep. I:189; EX6, SBI ¶14.d; EX21, Solow Dep. 537-538.) Even after the planned acquisition failed, the Lindberg-affiliated counterparties did not "repurchase" the collateral from PBLA and, instead, loaned the funds to AFA or other Lindberg-affiliated and -controlled entities. (EX21, Solow Dep. 549-550.)

*Third*, there was no collateral underlying and securing PBLA's interest in at least three of the Repos. Under these Repos, which totaled more than $54 million, PBLA purportedly acquired an interest in an investment owned by one of three FinCos. However, at the time Lindberg signed the Repos, none of the three FinCos possessed the represented collateral. (*See, e.g.*, EX52, Closing and Wire Instructions;

16

EX15, Herwig Dep. I:211-218.) Instead, the FinCos used PBLA's funds to purchase the very collateral that was supposed to have collateralized the transactions. (EX52, Closing and Wire Instructions; EX15, Herwig Dep. I:209-18.) Because the collateral was only purchased after receiving PBLA's cash, PBLA had effectively provided unsecured loans to the FinCos, putting the 2017 ULICO Trust at great risk. Moreover, because the collateral was purchased with the funds raised from the Repos, these transactions cannot be considered Repos at all. (EX35, Merrill Expert Report ¶¶165, 211-214.) Lindberg used the cash raised through these three Repos and reinvested the cash back into PBLA as paid-in capital, thereby artificially improving PBLA's capital position. (BSF ¶12.) PBLA, in turn, used these funds to make a $34 million loan to AFA. (*Id.*)

According to Dr. Merrill, the Repos served no economic purpose from the perspective of PBLA, ULICO, or their policyholders because (1) Lindberg controlled the lender, borrower, and collateral; (2) the borrowers had no intent or ability to repay the funds; and (3) the collateral was not liquid or marketable and, as is necessary for riskier collateral, no haircuts were given to the collateral's value and it was never reassessed. (EX35, Merrill Expert Report ¶¶201-10.) In addition, since the Repos were continually rolled over with no intent to repay them and the value of the collateral was never given a haircut, the Repos were illiquid and should not have been considered the economic equivalents of cash. (*Id.* ¶¶215-21.)

## V. The Fallout of Lindberg's Fraudulent Schemes

On June 27, 2019, the Wake County Superior Court granted NCDOI's

17

petition for an order of rehabilitation for the NC Insurance Companies based on the companies lacking sufficient liquidity to meet their outstanding liabilities due to their Lindberg-affiliated transactions. (EX10, Rehabilitation Order; EX8, Verified Petition.)

In May 2020, the Bermuda Monetary Authority ("BMA"), over concerns about PBLA's solvency, appointed an independent party to review certain PBLA compliance and solvency issues. (EX9, PBLA Liquidator Dec. ¶¶34-37.) In September 2020, the Supreme Court of Bermuda granted BMA's petition to wind-up PBLA's business operations and to appoint a liquidator. (*Id.* ¶38.) On December 3, 2020, PBLA's liquidator commenced a Chapter 15 bankruptcy proceeding in the Southern District of New York. (*Id.* ¶43.)

## VI. Lindberg's Criminal Conspiracy to Commit Investment Adviser Fraud

After the SEC filed its Complaint, **Herwig**, **Solow**, and Eric **Bostic**, an employee of another Lindberg affiliate, each admitted to engaging in a conspiracy with Lindberg to commit investment adviser fraud, in violation of Advisers Act Sections 206(1) and (2). (*United States v. Herwig*, 22-cr-314 (W.D.N.C.), EX4, Plea Agreement [ECF 6], EX5, HFB [ECF 19]; *United States v. Solow*, 22-cr-315 (W.D.N.C.), EX6, SBI [ECF 3], EX7, Solow Deferred Prosecution Agreement [ECF 6-1] ¶3; Bostic Non-Prosecution Agreement_ECF80-3 ¶4.) At their depositions in this case, Herwig admitted the statements in his Factual Basis were "correct" and "true," (EX15, Herwig Dep. I:24-25), Solow admitted the facts outlined in his Bill of Information were "accurate[]" and "true," (EX21, Solow Dep. 298), and Bostic

18

admitted the facts described in his Statement of Facts were "accurate[]" and "true,"

(EX22, Bostic Dep. 10).

They also each admitted to engaging in numerous circular, conflicted, and

fraudulent transactions with Lindberg's web of entities using insurance company

funds, including the same misappropriation of $55 million dollars through the SPV-

to-FinCo Conversions and the sham illiquid Repos alleged in the SEC's Complaint.

(*See generally* EX5, HFB; EX6, SBI.) They admitted these transactions put the

interests of Lindberg ahead of his client insurance companies' interests. (EX5, HFB

¶9.f; EX15, Herwig Dep. I:219; EX6, SBI ¶14.e; EX21, Solow Dep. 557-558.)

On November 5, 2024, Lindberg pleaded guilty to a conspiracy to commit

investment adviser fraud. (*United States v. Lindberg*, 23-cr-48 (W.D.N.C.), EX1,

Indictment [ECF 1] ("LI"); EX2, Plea Agreement [ECF 40] ("LPA"); EX3, LFB

[ECF 42].) Lindberg admitted that in carrying-out his conspiracy, he and others

(1) engaged in "circular, non-economic transactions" with Lindberg-affiliated entities

using his insurance companies' funds and (2) made false and misleading statements

regarding those transactions. (EX3, LFB ¶5.)

## STATEMENT OF THE QUESTIONS PRESENTED

1. Are SASL and Lindberg investment advisers under the Advisers Act?

2. Is the SEC entitled to summary judgment on Count I against SASL and
   Lindberg, finding that they violated Advisers Act Sections 206(1) and 206(2)?

3. Is the SEC entitled to summary judgment on Count II against Lindberg,
   finding he aided and abetted SASL's Advisers Act violations?

## STATEMENT OF THE ELEMENTS

The Advisers Act defines an "investment adviser" as any person who (1) for compensation, (2) is engaged in the business of, (3) advising others, directly or indirectly, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. 15 U.S.C. § 80b-2(a)(11). This is a "broad definition," *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007), and reaches persons who receive compensation for investing funds for their client or who advise their "customers by exercising control over what purchases and sales are made with their clients' funds." *Abrahamson v. Fleschner*, 568 F.2d 862, 870-71 (2d Cir. 1977), *overruled in part on other grounds by Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979); *see also SEC v. Peters*, No. 5:17-CV-630-D, 2021 WL 1112387, at *6 (E.D.N.C. Mar. 22, 2021).

Investment advisers owe fiduciary duties to their clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963). Investment advisers thus have duties of "utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [their] clients." *Id.* Section 206(1) prohibits an investment adviser from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6. Section 206(2) prohibits an investment adviser from engaging "in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client." *Id.* A violation of Section 206(1) requires proof of *scienter*, which

20

may be established by a showing of recklessness. *SEC v. Pirate Investor, LLC*, 580 F.3d 233, 241 (4th Cir. 2009); *Peters*, 2021 WL 1112387, at \*6. Negligence is sufficient to establish a violation of Section 206(2). *Robare Group, Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019); *Peters*, 2021 WL 1112387, at \*6.

## ARGUMENT

### I.    Summary Judgment Standard

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a movant establishes that there is no genuine issue of material fact, the opposing party must come forward with "specific facts" showing that there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). This case involves numerous breaches of fiduciary duty and lots of misrepresentations and omissions. But to obtain summary judgment, even **one** violation is enough to award summary judgment. *See, e.g., SEC v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at \*36 (C.D. Cal. Mar. 16, 2006).

### II.    Lindberg and SASL Were Investment Advisers.

SASL, a former SEC-registered investment adviser, admits that it was an investment adviser. (SASL Answer ¶¶4, 20, 44, 49.)

Lindberg, SASL's owner and a member of SASL's investment committee, was also an investment adviser. From June 2017 through 2018, Lindberg directed,

21

managed, and controlled the investment decisions made by SASL's advisory clients NC Insurance Companies and PBLA. (*See supra* at 3-4, 8-12, 14-15.) He controlled what purchases and sales they made. He authorized, approved, and signed several of the agreements that facilitated the two fraudulent schemes at issue here; the SPV-to-FinCo Conversions and the sham PBLA Repos. (*See supra* at 11-12, 15.)

Accordingly, Lindberg was engaged in the business of providing investment advice and making investment decisions. *See Peters*, 2021 WL 1112387, at *6 ("A person who owns and manages the funds of an investment adviser company and is compensated by the investment adviser company by a salary or a percentage of net profits or capital gains is also considered an investment adviser for purposes of Section 206."); *United States v. Elliott*, 62 F.3d 1304, 1310-1311 (11th Cir. 1995) (executives were "investment advisers" because they advised on investment decisions, controlled clients' investments, and selected investments); *SEC v. Haarman*, No. A-21-CV-00235-LY, 2022 WL 2782648, at *3 (W.D. Tex. Jan. 25, 2022) (fund owners and managers who were responsible for decision making and identified and acquired assets on the funds' behalf were investment advisers); *SEC v. ABS Manager, LLC*, No. 13cv319-GPC (BGS), 2014 WL 7272385, at *4 (S.D. Cal. Dec. 18, 2014) ("investment advisers can 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds."); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 652-53 (D. Conn. 2018) (individual who selected and managed client investments and signed investment agreements was an investment adviser).

22

Lindberg was "compensated" for his investment advice through his ownership of SASL, the misappropriated funds he diverted to AFA, the dividends SASL issued to his affiliated entities, and the loans SASL made with its ill-gotten advisory fees. (*See supra* at 5, 8.) *Peters*, 2021 WL 1112387, at *6 (investment adviser's owner and founder can satisfy the "compensation" element by receiving "a salary or a percentage of net profits or capital gains") (citing numerous circuit court opinions); *Haarman*, 2022 WL 2782648, at *3 (same); *Ahmed*, 308 F. Supp. 3d at 652-53 ("misappropriation of investor funds is sufficient, by itself, to meet the 'compensation' element.").

Additionally, SASL notified its advisory clients that Lindberg was providing them investment advice. The Advisers Act required SASL to provide its advisory clients a "brochure supplement" identifying the "supervised persons" who "provide[d] advisory services to [the] client." *See* 17 C.F.R. § 275.204-3(b)(3). SASL's 2017 and 2018 brochure supplements thus identified Lindberg as being a "Supervised Person" who was providing investment advice to SASL's clients. (*See* EX28 and EX30.)

Finally, Lindberg admitted in his criminal plea to being the owner and a director of SASL and to being "an investment adviser, or a person associated with an investment adviser." (EX3, LFB ¶1; EX2, LPA ¶8.b (agreeing to U.S.S.G. § 2B1.1(b)(20)(A)(iii) enhancement).)

23

### III. Lindberg and SASL Violated Advisers Act Sections 206(1) and 206(2).

The Advisers Act was enacted "to achieve a high standard of business ethics in the securities industry." *Capital Gains*, 375 U.S. at 186. As part of investment advisers' above-described fiduciary duties, *see id.* at 194, they must act at all times in their clients' best interest and tell their clients about "all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which [is] not disinterested." *Id.* at 191-92.

#### A. The Multiple Criminal Pleas Establish Lindberg's and SASL's Advisers Act Liability.

Lindberg and Herwig each admitted to knowingly engaging in a multi-year conspiracy to violate Advisers Act Sections 206(1) and 206(2). These convictions and the factual underpinnings of their pleas—which largely mirror the allegations in the SEC's complaint—establish the elements of the SEC's Sections 206(1) and 206(2) claims alleged against Lindberg and SASL. Collateral estoppel bars defendants from re-litigating any factual or legal issues that were decided against the defendant in a prior proceeding. *In re Microsoft Corp. Antitrust Litig.*, 355 F. 3d 322, 326 (4th Cir. 2004). Collateral estoppel precludes re-litigating issues in a subsequent proceeding if the following elements are met:

> (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

24

*Id.* "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996) (internal quotation marks and citation omitted); *see also Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951) ("a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding.").

Courts may grant summary judgment based on collateral estoppel from a defendant's criminal conviction. *SEC v. Farkas*, 557 Fed. Appx. 204, 207 (4th Cir. 2014). Courts routinely do so based on convictions in parallel criminal cases where the facts and schemes underlying the criminal conviction are the same as the facts establishing liability in the SEC's case. *Id.* at 207; *Peters*, 2021 WL 1112387, at *4-7 (applying collateral estoppel and granting SEC summary judgment on Sections 206(1) and 206(2) claims, based on defendant's criminal conviction); *SEC v. Bennett*, No. 8:17-cv-2453-PX, 2022 WL 279826, at *3-4 (D. Md. Jan. 28, 2022) (summary judgment for SEC based on criminal conviction, which shared same factual and legal issues); *SEC v. Bilzerian*, 29 F.3d 689, 693-94 (D.C. Cir. 1994); *SEC v. Genovese*, 553 F. Supp. 3d 24, 42 (S.D.N.Y. 2021).

Courts have also found that a criminal conspiracy conviction warrants the application of collateral estoppel on the SEC's securities fraud claims in a parallel action. *See SEC v. Quinlan*, No. 02-cv-60082, 2008 WL 4852904, at *4-5 (E.D. Mich. Nov. 7, 2008) (conspiracy to commit mail and wire fraud conviction resulted in

25

collateral estoppel on securities fraud charges); *SEC v. Resnick*, 604 F. Supp. 2d 773, 779-80 (D. Md. 2009) (conspiracy to commit securities fraud conviction resulted in collateral estoppel on securities fraud charges).

Here, Lindberg's conspiracy to violate Advisers Act Sections 206(1) and 206(2) conviction entitles the SEC to summary judgment on its Section 206 claims. To establish a Section 206 violation, the SEC must show that defendant (1) was an investment adviser, (2) used mail or any instrumentality of interstate commerce (3) to employ a device, scheme, or artifice to defraud any client or prospective client and/or engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client (4) with *scienter* (or for 206(2), with negligence). *See SEC v. Gotchey*, No. 91-CV-1855, 1992 WL 385284, *2 (4th Cir. Dec. 28, 1992); *Peters*, 2021 WL 1112387, at *6. In his plea, Lindberg "admit[ted] to being in fact guilty as charged in Count[ ] One" of the Indictment. (EX2, LPA ¶1.) Count I set forth 186 paragraphs detailing Lindberg's conspiracy. The factual allegations in the SEC's Complaint mirror the facts underlying Lindberg's conspiracy conviction. Each arises from Lindberg's fraudulent scheme to misappropriate $57 million dollars from the NC Insurance Companies through the SPV-to-FinCo Conversions and to funnel millions of dollars of cash from PBLA to Lindberg-owned affiliates through prohibited and sham Repo investments. (*Compare* Complaint ¶¶1-122 *with* EX1, LI ¶¶1-9, 51-146.)

Lindberg stipulated that he owned and was a director of SASL and that his offense involved a violation of a securities law at the time he was "an investment

adviser, or a person associated with an investment adviser." (*See* EX3, LFB ¶1; EX2, LPA ¶8.b (agreeing that U.S.S.G. § 2B1.1(b)(20)(A)(iii), "Violation of Securities Law by Investment Adviser Associate," applied to his offense).) Lindberg further stipulated that he: (1) "knowingly and willfully" conspired to "engage[ ] in circular, non-economic transactions among [his] web of entities using insurance company funds"; (2) "engage[d] in monetary transactions affecting interstate and foreign commerce"; and (3) made "various material false and misleading statements" and omissions to SASL's advisory clients. (EX3, LFB ¶¶3-5.) In other words, Lindberg admitted to engaging in a scheme to defraud and to acting with *scienter*. Accordingly, based on collateral estoppel, Lindberg should be precluded from relitigating his liability for engaging in investment adviser fraud and the SEC should be awarded summary judgment on its Advisers Act claims against Lindberg.

Collateral estoppel not only establishes Lindberg's liability, but also prevents his company, SASL, from challenging the Advisers Act charges. While the doctrine typically applies only against those who were parties to a previous judgment, collateral estoppel also is appropriate "based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). One such "substantive legal relationship" includes *respondeat superior*. *See Echeverria v. Bank of Am., N.A.*, 632 Fed. Appx. 1006, 1008 (11th Cir. 2015); *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 87 (2d Cir. 2000); *see also Peters*, 2011 WL 1112387, at *5 (although investment advisory firms

27

were non-parties to owner's criminal proceedings, "they are liable for [owner's] violations under the principle of respondeat superior").

Here, Lindberg's and Herwig's convictions establish SASL's liability. There is no dispute that Lindberg and Herwig were high-ranking agents of SASL. The fraud to which Lindberg and Herwig pleaded guilty is therefore imputed to SASL because SASL is liable for its agents' acts. *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 406 (4th Cir. 1985) (corporation responsible for actions of employees acting within the scope of their authority); *Superior Performers, Inc. v. Meaike*, No. 1:13CV1149, 2014 WL 5819826, at *12 (M.D.N.C. Nov. 10, 2014) ("A corporation acts through its officers, employees or agents."). In addition, Herwig's guilty plea detailed the essential facts of their conspiracy to commit investment adviser fraud; including knowingly and willingly carrying-out a fraudulent scheme to misappropriate over $55 million dollars from the NC Insurance Companies through the SPV-to-FinCo Conversions and to funnel money to Lindberg through the sham Repo agreements, the same conduct that constitutes the basis of SASL's liability in this case. (*See generally*, EX5, HFB ¶¶1-12.) Accordingly, collateral estoppel precludes SASL from challenging its liability in this case.

### B. Undisputed Facts Further Establish Lindberg's Advisers Act Violations.

Independent of collateral estoppel's preclusive effect, the undisputed facts establish that Lindberg knowingly devised two schemes to defraud SASL's advisory clients by funneling hundreds of millions of dollars to himself and to his other

28

businesses for his own benefit. Lindberg, Herwig, and Solow have each admitted to knowingly conspiring to commit investment adviser fraud that involved (1) illogical circular transactions among Lindberg's companies using insurance company money and (2) materially false statements and omissions. (EX3, LFB ¶5; EX5, HFB ¶8; EX6, SBI ¶13.)

*First*, Herwig and Solow admit their conspiracy **with** Lindberg involved misappropriating $55 million[3] dollars from the NC Insurance Companies through the SPV-to-FinCo Conversions and making numerous false and misleading statements and omissions to the NC Insurance Companies and others. (EX5, HFB ¶¶9.b, 10; EX6, SBI ¶¶14.b, 15.) In connection with the first scheme, Lindberg breached his fiduciary duty by providing advice that was not in his clients' best interest when he knowingly caused the NC Insurance Companies to sell their SPV investments and immediately repurchase interests in the same underlying assets through FinCos at a higher price. (*See supra* at 8-13.) Lindberg misappropriated the difference in price, $57 million, by inserting AFA, a company Lindberg owned and controlled, into the SPV-to-FinCo Conversions. AFA, which was inserted into the transactions for the sole purpose of diverting millions of dollars away from NC Insurance Companies to be used for non-insurance company purposes, performed no services whatsoever for its windfall. And its role and profits were never disclosed to the NC Insurance Companies notwithstanding the clear conflict of interest. (*See supra* at 13.)

---

[3] Again, by the SEC's calculation, Lindberg and his co-conspirators misappropriated $57 million. (EX60, FinCo Closing Instructions; EX35, Merrill Expert Report ¶134.)

Lindberg, Herwig, and Solow also falsely represented that the FinCo investments were unaffiliated, managed by an independent third party, and outside of Lindberg's control. (*See supra* at 9-10.) Lindberg also directed Herwig and Solow to use FinCo funds (NC Insurance Company funds) to fund and refinance Lindberg's real estate purchases. (EX5, HFB ¶9.b; EX6, SBI ¶14.b.) Lindberg was directly involved in all aspects of the SPV-to-FinCo Conversions. (*See supra* at 8-13.) In violation of Lindberg's and Herwig's fiduciary duty to their clients, Herwig and Solow have admitted that the Conversions put the interests of Lindberg ahead of his client insurance companies' interests. (EX5, HFB ¶9.f; EX15, Herwig Dep. I:219; EX6, SBI ¶14.e; EX21, Solow Dep. 557-558.)

Courts have repeatedly held that misappropriating client funds, as Lindberg orchestrated in the SPV-to-FinCo Conversions, is a material violation of Sections 206(1) and 206(2). *See, e.g.*, *SEC v. Brown,* 579 F. Supp. 2d 1228, 1245 (D. Minn. 2008) (granting summary judgment on Sections 206(1) and 206(2) claims where defendants misappropriated client funds and attempted to conceal misappropriation), *aff'd* 658 F.3d 858 (8th Cir. 2011); *SEC v. Desai*, 145 F. Supp. 3d 329, 336 (D.N.J. 2015) (same); *SEC v. Boucher*, No. 20-CV-1650 DMS (MSB), 2022 WL 17961486, at *9 (S.D. Cal. Feb. 8, 2022) (same); *SEC v Nutmeg Group, LLC*, 162 F. Supp. 3d 754, 778-80 (N.D. Ill. 2016) (same, Section 206(2)); *see also SEC v. Kinetic Investment Group, LLC*, No. 8:20-cv-394-MSS-SPF, 2024 WL 4869623, at *30 (M.D. Fla. Nov. 22, 2024) (misappropriation of investor funds for personal use constitutes securities fraud); *SEC v. Laura*, 680 F. Supp. 3d 204, 233 (E.D.N.Y. 2023) ("[A]n undisclosed

30

intent to misappropriate funds is sufficient to establish scheme liability on a motion for summary judgment.").

*Second*, Herwig and Solow admit their conspiracy **with** Lindberg involved (a) causing PBLA to invest hundreds of millions of dollars in illiquid sham Repos with Lindberg affiliates, knowing the investments violated PBLA's Investment Guidelines, and (b) deceiving ULICO and others about the true nature of the assets in the 2017 ULICO Trust. (EX5, HFB ¶¶9.d; EX6, SBI ¶¶14.d; BSF ¶¶8, 13-18.) Lindberg was directly involved in all aspects of these sham Repos. Lindberg facilitated and approved Repos by executing CTAs, signing agreements and amendments on behalf of all counterparties, and executing closing and wire instructions. (*See supra* at 15.) Lindberg authorized the Repo transactions knowing that his affiliates had no intent or ability to repay PBLA within the stated maturity period of 90-days. Knowing the Puerto Rico Chapter 6 requirements and that his affiliates did not intend to repay the Repos, Lindberg nevertheless directed Solow to continually roll maturity dates forward—90 to 180 to 270 to 360 days—while PBLA was reporting the Repos to ULICO as "cash equivalents." (*See supra* at 14-16.) Even though some of the Repos had no underlying collateral, and therefore were not Repos at all, Lindberg authorized the transactions. (*See supra* at 16-17.) In violation of Lindberg's and Herwig's fiduciary duty to their clients, Herwig and Solow have admitted that the Repos put the interests of Lindberg ahead of his client insurance companies' interests. (EX5, HFB ¶9.f; EX15, Herwig Dep. I:219; EX6, SBI ¶14.e; EX21, Solow Dep. 557-558.)

When an investment adviser fails to invest client funds as represented to clients, such as illiquid sham Repos represented as "cash equivalents," the adviser violates the Advisers Act. *See, e.g.*, *Kinetic*, 2024 WL 4869623, at *23-24 (granting SEC summary judgment on Advisers Act claim when adviser invested clients funds in illiquid investments, which was contrary to statements that investments were liquid); *SEC v. Welliver*, No. 11-CV-3076 (SER), 2013 WL 12149244, at *18 (D. Minn. Apr. 30, 2013) (granting SEC summary judgment where adviser invested client funds that violated illiquidity investment restrictions); *SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *8, 18, 24 (S.D. Fla. Sept. 24, 2008) (adviser's violation of client's investment restrictions violated Section 206); *see also SEC v. Navellier & Assocs.*, 108 F.4th 19, 37 (1st Cir. 2024) (adviser's omissions regarding investment risk were material as a matter of law).

Finally, Lindberg acted with *scienter*, which may be supported by intentional conduct or recklessness. *Pirate Investor*, 580 F.3d at 241. Recklessness is "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).

Here, Lindberg has admitted to "knowingly and willfully" joining the conspiracy to violate Sections 206(1) and 206(2). Lindberg's admission in his criminal plea is sufficient to establish *scienter* here. *Peters*, 2021 WL 1112387, at *7

32

(Sections 206(1) and 206(2) criminal conviction sufficient to establish scienter, on summary judgment, for SEC's Sections 206(1) and 206(2) claims); *SEC v. Hilsenrath*, No. C 03–03252 WHA, 2008 WL 2225709, at *4-5 (N.D. Cal. May 29, 2008) (defendant's plea admitting to "knowingly and willfully" committing securities fraud was sufficient to establish *scienter* for summary judgment on SEC's fraud claim).

Additionally, on the SPV-to-FinCo Conversions, Lindberg knowingly inserted AFA into the transactions for the sole purpose of misappropriating funds away from the NC Insurance Companies. He knew AFA's "profits" were obtained to the detriment of the NC Insurance Companies. (EX44; EX45.) He executed several documents facilitating the SPV-to-FinCo Conversions, and he failed to disclose the clear conflict of interest he had in AFA's involvement in these transactions. (*See supra* at 12-13, 15-16.) Lindberg knew PBLA was required to comply with its Investment Guidelines, but he directed, facilitated, and approved PBLA's purchase of the illiquid sham Repos. He knew the Repo counterparties did not have intention or ability to repurchase the notes within the stated 90-day maturity term. And Lindberg instructed Solow and others to "keep rolling them over if nobody is asking any questions." (EX21, Solow Dep. 545.)

Further, there is also no genuine fact issue that Lindberg acted at least negligently, which is the failure to "exercise reasonable care under all circumstances." *Robare*, 922 F.3d at 477. Lindberg acted unreasonably, to say the least, when he misappropriated $57 million in client funds, when he concealed AFA's involvement in the SPV-to-FinCo Conversions, and when he directed,

facilitated, and approved PBLA's investments in sham Repos that violated its Investment Guidelines. (*See supra* at 8-17.) Given the undisputed evidence of what Lindberg knew and what he failed to do, no reasonable jury could conclude Lindberg was not at least negligent.

### C.    Undisputed Facts Establish that SASL Violated the Advisers Act.

As agents of SASL, Lindberg's and Herwig's fraudulent schemes are imputed to SASL. SASL is an LLC. It is axiomatic that an entity like SASL can only act through its officers and agents, and, consequently, the acts of its officers and agents constitute the acts of SASL under basic principles of agency. *Automated Medical*, 770 F.2d at 406; *Superior Performers,* 2014 WL 5819826, at *12; *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 2242952, at *10 (M.D.N.C. May 22, 2017) (Eagles, J.); *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1249 (11th Cir. 2012); *SEC v. Wash. Invest. Network*, 475 F.3d 392, 393 (D.C. Cir. 2007).

Likewise, the *scienter* of an entity's officers and agents may be attributed to the entity itself to establish liability under the federal securities laws. *SEC v. Causwave, Inc.*, No. 1:15CV1068, 2018 WL 4625407, at *4 (M.D.N.C. Sept. 26, 2018); *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1106–07 (10th Cir.2003) (collecting cases); *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1305 (S.D. Fla. 2007); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007).

As detailed above, from 2017 through 2018, Lindberg, Herwig, and others under their control engaged in a scheme to defraud SASL's advisory clients while they were SASL agents. (EX5, HFB ¶¶1, 5-12; EX6, SBI ¶¶12-17; EX1, LI ¶¶1, 3-6.)

34

Herwig has admitted to engaging in numerous fraudulent schemes and carrying out numerous acts in furtherance of those schemes to defraud SASL's advisory clients during the period he served as SASL's director and portfolio manager, a member of SASL's investment committee, and a "Supervised Person." (*See generally* EX5, HFB ¶¶1, 5-12.) Like Lindberg, Herwig's conduct is imputed to SASL.

## IV. Lindberg Aided and Abetted SASL's Advisers Act Violations.

Aiding and abetting liability under the Advisers Act requires: (1) the existence of an independent primary violation; (2) knowledge or reckless disregard by the alleged aider and abettor of the primary violation and of his own role in furthering it; and (3) "substantial assistance" in the commission of the primary violation. *See* Advisers Act Section 209(f); *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *see also Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir. 1991) (applying same test for aiding and abetting securities fraud). The recklessness standard is satisfied where the defendant ignores red flags or where the violation was so obvious the individual must have been aware of it. *SEC v. Kokorich*, 663 F. Supp. 3d 63, 83 (D.D.C. 2023). The "substantial assistance" element is met when defendant "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012); *SEC v. Familant*, 910 F. Supp. 2d 83, 90, 99 (D.D.C. 2012) (same).

As detailed above, SASL violated the Advisers Act. Lindberg knew of SASL's violations through his direct involvement in the improper transactions and the

numerous breaches of his fiduciary duty. He also provided "substantial assistance" by directing, authorizing, and facilitating the fraudulent transactions and by concealing material information from the NC Insurance Companies' boards of directors, GBIG, and PBLA. (*See supra* at 8-17.)

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion for summary judgment as to Defendants Lindberg and SASL on Counts I and II.

## BRIEF CERTIFICATION

Pursuant to Local Rule 7.3(d) and Dkt. No. 104, the SEC certifies that this brief contains 8,716 words, excluding the caption, signature lines, and certificate of service.

Dated: January 28, 2025

Respectfully Submitted,

  */s/ Alyssa A. Qualls*
Alyssa A. Qualls (quallsa@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
SEC Chicago Regional Office
175 West Jackson Blvd, Suite 1450
Chicago, Illinois 60604
(312) 353-7390

*Attorneys for Plaintiff U.S. Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that I provided service of the foregoing document, via ECF filing, to all counsel of record on January 28, 2025.

                     */s/ Alyssa A. Qualls*

**Gregory E. Lindberg**
Alisson Mullins
L. Cooper Harrell
Turning Point Litigation Mullins Duncan
Harrell & Russell PLLC
300 North Greene Street, Suite 2000
Greensboro, NC 27401
amullins@turningpointlit.com
charrell@turningpointlit.com

Ryan J. Meyer
Brandon McCarthy
Katten Muchin Rosenman LLP
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Ryan.Meyer@katten.com
Brandon.McCarthy@katten.com

*Attorneys for Defendant Gregory E. Lindberg*

**Christopher Herwig**
Claire Rauscher
Womble Bond Dickinson (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, NC 28202
Claire.Rauscher@wbd-us.com

Britt Biles
Womble Bond Dickinson (US) LLP
2001 K Street, NW, Suite 400 South
Washington, DC 20006
Britt.Biles@wbd-us.com

*Counsel for Defendant Christopher Herwig*

**Standard Advisory Services Limited**

Mark A. Jones
Alan M. Ruley
Bell Davis & Pitt, P.A.
POB 21029
Winston-Salem, NC 27120
mjones@belldavispitt.com
aruley@belldavidpitt.com

*Attorneys for Defendant*
*Standard Advisory Services Limited*